. Mary Williams CAZALAS,
Plaintiff-Appellant,

v.

UNITED STATES DEPARTMENT OF JUSTICE, Attorney General William French Smith and United States Attorney John Volz, Defendants-Appellees.

No. 80–3565.

United States Court of Appeals,
Fifth Circuit.*
Unit A

Nov. 5, 1981.

* Former Fifth Circuit case, Section 9(1) of Public Law 96-452—October 14, 1980.

Sylvia Roberts, Baton Rouge, La., Mary Williams Cazalas, New Orleans, La., for plaintiff-appellant.

Susan A. Ehrlich, Leonard Schaitman, C. Frederick Geilfuss, Dept. of Justice, Civil Div., Washington, D. C., for defendants-appellees.

Before CHARLES CLARK, TATE and SAM D. JOHNSON, Circuit Judges.

TATE, Circuit Judge.

Plaintiff Mary Williams Cazalas appeals from an order denying her attorney fees incurred in bringing an action to compel production of documents under the Freedom of Information Act, 5 U.S.C. § 552. The trial judge, in affirming the magistrate's determination, held that Cazalas did not "substantially prevail" because she failed to meet the four-part test that we established in *Chamberlain v. Kurtz*, 589 F.2d 827 (5th Cir.), *cert. denied*, 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979) and *Blue v. Bureau of Prisons*, 570 F.2d 529 (5th Cir. 1978). On appeal Cazalas contends that she "substantially prevailed" and that the district court abused its discretion in not awarding her fees for herself and her attorney. Because we find that the criteria to be used in determining whether Cazalas "substantially prevailed" are not those set out in *Blue* and *Chamberlain, supra*, and that the test established in those cases is directed, instead, to determining the issue of attorney's fees, we reverse on the issue of whether Cazalas "substantially prevailed," and we remand to the district court for the purpose of determining whether Cazalas is entitled to attorney's fees for herself and another attorney.

*Overview*

In brief overview of Cazalas's central contention, which we ultimately uphold, by her request in December 1978, and consistently thereafter she sought memoranda relative to the quality of her work that were used as a basis for the decision of United States Attorney John Volz to discharge her, particularly those obtained by EEO investigator Morman from United States District Judges Rubin and Sear. The purpose at all times was to secure documents relevant to her claim of sex discrimination in the United States Attorney's Office and her defensive allegations that other reasons for the discriminatory treatment and her discharge were pretextual. Although the Department of Justice furnished her many other documents, it did *not* release the notations of Morman until late December 1979, six months after suit was filed, and it did not release to her a letter dated December 28, 1978 by Volz to the Deputy Attorney General (which stated the reasons why Volz

was recommending her discharge) until September 11, 1979, some three months after suit was filed, even though in her administrative appeal on March 19, 1979, she had specifically requested release of that letter. Her FOIA suit was filed on June 12, 1979, after the Department of Justice had exceeded statutory delays in complying with (or explaining why not) her request for FOIA documents and had informed her that, accordingly, she could treat her application as denied.

*Facts*

The facts in the case are rather lengthy, but a complete exposition is necessary in order to demonstrate that Cazalas did "substantially prevail" in her action to compel the production of documents under the Freedom of Information Act.

Cazalas was employed as an Assistant United States Attorney for the Eastern District of Louisiana from February 1971 to April 1979, when she was terminated by then Deputy Attorney General Benjamin R. Civiletti. She filed two complaints with the Equal Opportunity Commission prior to her termination, on October 7, 1978, and November 9, 1978. She filed a complaint alleging retaliation on April 21, 1979. The bases of these complaints were sex discrimination and denial of freedom of speech and due process that she claims grew out of facts that do not concern us here. What does concern us, however, is Cazalas's attempts to obtain certain documents that she needed in connection with the investigation of her EEOC case.

As a result of filing the EEO complaint on October 7, 1978, EEO investigator Morman was sent from the United States Department of Justice in Washington, D.C., to attempt to informally resolve Cazalas's complaint. Failure to conciliate resulted in Cazalas's submission of her formal complaint to the EEOC on November 9, 1978.

She filed a request with John Volz, the United States Attorney, for documents under the Freedom of Information Act and the Privacy Act on December 19, 1978. Cazalas requested (we mark with an asterisk (*) requests that included certain specific

centrally important documents not furnished to Cazalas until six months after suit was filed):

* 1. All letters, memoranda, reports, records, statements, notations of telephone conversations, and all other documents pertaining to Cazalas and her work as an assistant United States Attorney.

* 2. All letters, memoranda, reports, records, statements, notations of telephone conversations and all other documents written by any agent, employee, attorney or anyone else for, in or on behalf of themselves or the United States Department of Justice or anyone therein soliciting information pertaining to Cazalas and her work and all responses thereto.

3. A report by Robert Boitman or anyone else pertaining to the case of Edward Lee Wright and a conversation with Robert Glass.

4. All reports made by Robert Boitman pertaining to Cazalas and her work and all requests to him for information relative to Cazalas and her work.

5. All reports, documents, letters, memoranda, or statements pertaining to Cazalas and her work from Jeffrey Axelrod or Larry Klinger of the Civil Division, Department of Justice, Washington, D.C. and any and all requests to either Jeffrey Axelrod or Larry Klinger for information pertaining to Cazalas and her work.

6. All reports, documents, letters, notations, memoranda, or statements pertaining to Cazalas and her work from Susan Jarvis, Florence Quail, or Tony Kopera, attorneys for HUD, or Dr. Bruce Jarvis, husband of Susan Jarvis and a physician at the Veterans Administration Hospital in New Orleans, Louisiana, and all requests for information from Susan Jarvis, Florence Quail, Tony Kopera and Bruce Jarvis.

* 7. All reports, documents, letters, notations, memoranda, or statements pertaining to Cazalas and her work from Judge Alvin B. Rubin, Judge Morey L. Sear, Magistrate Ingard Johansen,

Judge Adrian Duplantier, and any other judges or magistrates and all requests to any judges or magistrates.

8.  All letters from all agencies either complimentary or critical of Cazalas and her work. She referred in particular, but not exclusively, to a letter from U.S. Customs Service sent to the office complimenting her work.

9.  All letters, memoranda, documents, notations, statements, and communications between the Department of Justice including the United States Attorney's Office for the Eastern District of Louisiana, and Judge Charles Schwartz, Patrick Breeden, Joseph Defley and Elaine Chauvin pertaining to her legal representation of the Government and SBA in the case of *Dore v. Kleppe.*

10. All letters, memoranda, notations, reports, or statements and any other documents sent by any employee, agent, or attorney of the United States Department of Justice, or anyone on behalf of the United States Department of Justice relative to Cazalas or her work to any agency, including inter-agency and intra-agency communications.

11. All material added to her personnel file or removed from her personnel file and any changes made in or to her personnel file by anyone since the appointment of John Volz as United States Attorney for the Eastern District of Louisiana.

12. All transcripts of all meetings or conferences in which her work or employment as an assistant United States attorney has been discussed. She referred in particular to a conference at which Lynn Champagne took notes and later produced a typed transcript of the notes.

United States Attorney John Volz acknowledged receipt of the request on December 22, 1978, and forwarded it to the Executive Office for United States Attorneys.

Cazalas did not receive a response to her December 19, 1978 request by January 29, 1979, and on that date, she decided to treat the delay as a denial and filed a formal appeal with the Freedom of Information Appeals Unit.[1] She received a response on February 6, 1979, in which Quinlan J. Shea, Jr., Director of Privacy and Information Appeals, informed Cazalas that he could not act until the Executive Office for United States Attorneys had made an initial determination of Cazalas's December 19, 1978 request. Shea also stated that if Cazalas did not receive a response from the Executive Office for United States Attorneys by the date of his letter, February 6, 1979, that she could treat Shea's letter as a denial of appeal, and bring an action in an appropriate federal court. Shea asked that Cazalas give "sympathetic consideration" to the heavy workload pending in the Executive Office for United States Attorneys.

On March 7, 1979, Cazalas went to Washington and received a response to her original request from Acting Director William Tyson of the Executive Office for United States Attorneys. Tyson stated, *inter alia,* that:

(1) Cazalas's request with respect to her official personnel file was being referred to the office of the Deputy Attorney General. (Subsequently, Cazalas did receive the ninety-three pages that were contained in her official personnel file on April 13, 1979[2]);

---

1.  Under the Freedom of Information Act, 5 U.S.C. §§ 552(a)(6)(A), (B), the agency from whom the request for the production of documents is made must respond not later than 10 working days unless there are unusual circumstances that justify an extension. The request for an extension must be made to the person making the request in writing. Under the Privacy Act, 5 U.S.C. § 552a(d)(3), the agency must respond not later than 30 days. *See* note 7 *infra.*

2.  Cazalas's official personnel file also contained a background investigation that was conducted by the F.B.I., and Cazalas's request was referred to the Bureau. This request, however, was eventually abandoned because Cazalas failed to provide the signature card that the F.B.I. required to release this file.

(2) Cazalas's personnel file that was maintained by the United States Attorney for the Eastern District of Louisiana was available to Cazalas on request;

(3) nineteen pages of Executive Office documents were being released to Cazalas;[3]

(4) although the United States Customs Service letter was received by the Office of the United States Attorney, they were unable to locate it.

(5) thirty-three pages[4] of Executive Office documents were being withheld pursuant to 5 U.S.C. § 552(b)(5) and (7)(C).[5]

Cazalas claims that at their meeting, Tyson denied Cazalas access to an eight-page letter written by USA John Volz on December 28, 1978, which formed the basis of her termination. Cazalas knew of the existence of the Volz letter only because she had been provided with a copy of a memo from Volz to Tyson that referred to the letter. Tyson did not specify to Cazalas the nature of the documents that he claimed were exempted under FOIA. Tyson notified Cazalas of her right to appeal.

Cazalas exercised her right to administrative appeal on March 19, 1979, in a letter to the Deputy Attorney General. She then specifically requested the following documents:

1. EEO investigator Morman's notes with respect to statements made by Judge Alvin B. Rubin and Judge Morey L. Sear relative to Cazalas's performance as an attorney.

2. EEO investigator Morman's notes with respect to various statements by Assistant United States Attorneys concerning Cazalas's competence.

3. United States Attorney John Volz's letter of December 28, 1978, to Deputy Attorney General Benjamin Civiletti concerning Volz's reasons why he wanted to terminate Cazalas.

4. a letter dated May 24, 1978, from Susan Jarvis, a HUD attorney concerning a complaint against Cazalas.

5. a letter dated June 9, 1978, from Jeffery Axelrod, concerning a complaint against Cazalas.

6. a memorandum from Robert Boitman that Cazalas observed in Volz's possession on October 3, 1978, with regard to the filing of a brief for a case with which Cazalas was involved.

7. any reports in connection with Cazalas's alleged statements about the judicial integrity of Judge Adrian Duplantier.

8. a letter of commendation that was sent from the United States Customs Service to the United States Attorney's Office for the Eastern District of Louisiana.

Everything that Cazalas specified in her appeal, with the exception of Volz's letter to Civiletti was in existence at the time of Cazalas's initial request on December 19, 1978. In any event, the government had notice as early as March 19, 1979, and possibly even March 7, 1979,[6] that Cazalas wanted the letter dated December 28, 1978, that Volz had sent to Civiletti. It also appears that most, if not all, of this material was covered by the admittedly broad language of Cazalas's original request. (With regard

---

**3.** There is some confusion in the record as to whether 18 pages or 19 pages were released to Cazalas. Cazalas claims that 12 pages of her own EEO complaint, and 6 pages of memoranda pertaining to her complaint were released.

**4.** The government later acknowledged that they had miscounted the documents and that there were 35, and not 33, withheld.

**5.** 5 U.S.C. § 552(b)(5) exempts "inter-agency or intra-agency memorandum or letters which would not be available by law to a party other than an agency in litigation with the agency."

**5** U.S.C. § 552(b)(7)(C) exempts investigatory records compiled for law enforcement purposes to the extent that production of such records would "constitute an unwarranted invasion of personal privacy." On her administrative appeal, this contention was not upheld, and the documents were released to her in September 1979, some three months after suit was filed.

**6.** Cazalas claims that when she met with Tyson in Washington on March 7, 1979, she asked for the letter orally and was refused.

to notes made of evaluations of her work by Judges Rubin and Sear in November, 1978 and then communicated to and noted by EEO Investigator Morman—matters withheld from Cazalas until six months after suit was filed; see items 1, 2, and 7 of initial request of December 19, 1978.)

Cazalas received an acknowledgment by the Office of the Associate Attorney General dated April 10, 1979, that informed Cazalas about the "substantial backlog of pending appeals" and that her appeal would be handled in order of its receipt. Cazalas waited two additional months and did not receive the documents that she had requested. We note that under FOIA, 5 U.S.C. § 552(a)(6)(A)(ii), the agency to which a request is directed has twenty days to make a determination of the appeal unless "unusual circumstances," 5 U.S.C. § 552(a)(6)(B), are involved. These "unusual circumstances" are limited to situations that are not involved in this case,[7] and in any event, the government went beyond the time allotted to it even if there were such unusual circumstances.

On June 12, 1979, Cazalas filed a FOIA complaint and a motion under *Vaughn v. Rosen*, 484 F.2d 820, 826–28 (D.C.Cir.1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), to require a detailed justification for any allegation that requested documents were exempt from disclosure, and an itemization and indexing of withheld documents. In her FOIA complaint, Cazalas requested the identical documents that she requested in her December 19, 1978 letter, adding three specified items:

1. The information referred to by Benjamin R. Civiletti in his letter of April 4, 1979 informing Cazalas that she was terminated as an Assistant United States Attorney effective April 20, 1979 in which he stated, "Your removal is based on information submitted by Mr. John Volz, United States Attorney, which shows that your professional performance and judgment have been unsatisfactory, that you will not submit to proper supervision by those in authority over you, and that you cannot be trusted to maintain confidentiality of matters assigned to you."

2. All statements referred to by EEO investigator David Morman in his counselor's report.

3. All statements obtained by EEO investigator Ray Saporito in his investigation of plaintiff's EEO complaint.

Although items 1 and 2 were not requested specifically by Cazalas in her initial letter, they were certainly covered by the language of that original request generally (insofar as in existence at that time), and in any event, Cazalas explicitly requested items 1 and 2 in her letter of March 19, 1979 to the Freedom of Information Appeals Unit.

Cazalas's motion under *Vaughn v. Rosen* was denied, but on July 23, 1979, the magistrate ordered the government to provide itemization, indexing, and specific objections per item on or prior to August 31, 1979. Meanwhile, Cazalas wrote to the Acting Equal Employment Opportunity Officer of the Department of Justice, Ted

---

**7.** 5 U.S.C. § 552(a)(6)(B) states:

(B) In unusual circumstances as specified in this subparagraph, the time limits prescribed in either clause (i) or clause (ii) of subparagraph (A) may be extended by written notice to the person making such request setting forth the reasons for such extension and the date on which a determination is expected to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days. As used in this subparagraph, "unusual circumstances" means, but only to the extent reasonably necessary to the proper processing of the particular request—

(i) the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request; (ii) the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or (iii) the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject-matter interest therein.

McBurrows, on August 1, 1979, and again requested all statements and affidavits obtained by Morman and Saporito. She renewed that request on August 13, 1979, after she had received notice that Anthony Moscato was appointed to be the Equal Opportunity Officer of the Department of Justice. She received the results of Saporito's investigation on September 1, 1979, shortly after Saporito had finished his investigation.[8] *The statements obtained by Morman, however, were not included.* The only thing that Cazalas received was a summary of the persons from whom statements had been obtained by Morman, without information as to their content (see note 9). In her acknowledgment of the receipt of Saporito's investigative report, Cazalas renewed her request for Morman's documents.

On August 31, 1979, the last day on which the government could produce the detailed itemization and index ordered by the magistrate, the government requested, and was given, an extension until September 12, 1979. On September 11, 1979, the government filed the affidavit of Susan A. Nellor, who processes requests for access to official records of the Executive Office for United States Attorneys. Nellor stated that all documents in possession of the Executive Office for United States Attorneys were being released to Cazalas. These documents included those that were originally withheld by Tyson on March 7, 1979. The letter from Volz to Civiletti, dated December 28, 1978, was attached to the Nellor memo. The remainder of the documents to which Nellor referred were released on September 21, 1979, by Shea.

On September 24, 1979, Cazalas wrote to the Department of Justice and stated that Nellor's affidavit of September 11 was not in compliance with the order of the magistrate to file an index of all documents. Cazalas also stated that Morman's material had not been produced and that Nellor ad-

mitted to withholding documents. Cazalas received a reply from Acting Deputy Director McWhorter of the Executive Office for United States Attorneys on November 20, 1979. McWhorter released eleven more documents to Cazalas that were overlooked due to "administrative oversight." He explained that Cazalas had misunderstood Nellor's affidavit and that the Executive Office for United States Attorneys had released all documents that were responsive to Cazalas's request with the exception of the eleven pages that McWhorter attached to his letter. McWhorter also stated that Nellor's affidavit did not purport to respond for the Equal Employment Office of the Department of Justice.

Between the time in which Cazalas notified the Department of Justice that Nellor's affidavit did not, in her opinion, comply with the July 23, 1979 order of the magistrate to provide an index, and the time in which McWhorter replied, Cazalas filed a rule to show cause why the government should not be compelled to provide an index of documents. On December 11, 1979, Susan Nellor filed a supplemental affidavit that attempted to clarify her September 11, 1979 affidavit to show that all documents in possession of the Executive Office for United States Attorneys and responsive to Cazalas's request were released. Also on December 11, 1979, Jay D. Scrivens, Acting Equal Employment Officer for the Department of Justice, filed an affidavit that maintained that the "statements" of Mr. Morman that Cazalas requested did not *"per se"* exist. Rather, Morman had taken handwritten notes during his interviews, and although the Department of Justice did not concede that disclosure of these notes was required, they would be released on a discretionary basis. Cazalas received these notes late in December, 1979.

Cazalas's rule to show cause was continued on several occasions until January 9,

---

**8.** Cazalas argues that Saporito finished his report on July 26, 1979, and that there was a delay in sending the material of over one month. The government, however, claims that Saporito's investigation was not completed un-

til sometime in August 1979. Given that Cazalas received a memo that had been written by Saporito in connection with the case and dated August 3, 1979, it appears that Saporito's investigation continued into August.

1980, when it was dismissed as moot. Cazalas acknowledged that she received all the documents that she requested. Cazalas then brought an action for attorney's fees for herself and her attorney under 5 U.S.C. § 552(a)(4)(E). The magistrate denied Cazalas the relief that she sought, and the district court affirmed.

*The Issue*

Cazalas argues that she is entitled to attorney's fees for herself and for her attorney and that the denial of fees by the magistrate, which denial was affirmed by the district court, was manifestly erroneous and an abuse of discretion. The threshold issue is did Cazalas "substantially prevail," so as to be *eligible* for the award of attorney's fees, admittedly awardable within the sound discretion of the district court.

*The Test For Whether Cazales "Substantially Prevailed"*

The magistrate held, and the district court affirmed, that Cazalas was not entitled to attorney's fees because Cazales did not "substantially prevail" in accordance with 5 U.S.C. § 552(a)(4)(E), which states: "The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." As the district court stated, it was "necessary" for the plaintiff to substantially prevail in order to have attorney's fees awardable. The district court did not consider the issue of whether it would have exercised its discretion to award attorney's fees if it had found that the plaintiff *had* met this essential threshold requirement—although it is perhaps a fair inference from its opinion that its discretion would have been exercised adversely to the plaintiff's claim for such relief.

The test that the magistrate used to determine whether Cazalas "substantially prevailed" was whether the following four criteria balanced in Cazalas's favor:

1. The benefit to the public deriving from the case

2. The commercial benefit to the complainant

3. The nature of plaintiff's interest in the records sought

4. The basis for the government's withholding of the requested documents.

These four criteria were articulated by the District of Columbia Circuit in *Nationwide Building Maintenance, Inc. v. Sampson*, 559 F.2d 704 (D.C.Cir.1977), based upon what that court perceived as legislative intent. The criteria were adopted by this court in *Blue v. Bureau of Prisons*, 570 F.2d 529 (5th Cir. 1978); *Chamberlain v. Kurtz*, 589 F.2d 827, 842 (5th Cir.), *cert. denied*, 444 U.S. 892, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979); *Lovell v. Alderete*, 630 F.2d 428 (5th Cir. 1980).

However, as in *Nationwide Building, supra*, these criteria are to be used to determine whether a discretionary award of attorney's fees is justified under 5 U.S.C. § 552(a)(4)(E), and *not* whether the complainant in an FOIA suit has substantially prevailed. The proper test to be applied to determine whether Cazalas substantially prevailed involves a showing that "prosecution of the action could reasonably be regarded as necessary to obtain the information and that the action had a substantial causative effect on the delivery of the information." *Lovell, supra*, 630 F.2d at 432, quoting *Vermont Low Income Advocacy Council, Inc. v. Usery*, 546 F.2d 509, 514 (2d Cir. 1976). Further, the mere fact that the documents requested were not released until after the suit was instituted, without more, is not enough to establish that a complainant has substantially prevailed. *Lovell, supra*, 630 F.2d at 432. *Cox v. United States Department of Justice*, 601 F.2d 1, 6 (D.C.Cir.1979). Because the incorrect standard was applied below, it is necessary for us to apply the *Lovell* test.

*Application of the* Lovell *test of "substantially prevailing" to the present facts*

The voluminous record below is sufficiently confused so that it is difficult, if not impossible, for this court to determine exactly what documents requested by Cazalas were released at what time by the govern-

ment. It is clear, however, that two very important pieces of information released by the government—the letter of December 28, 1978, from John Volz to Benjamin Civiletti, and the notes taken by David Morman in connection with his conciliatory investigation of Cazalas's informal EEO complaint of October 1978—[9] were released under circumstances that indicate that Cazalas's persistence, and the institution of the FOIA complaint in June 1979, had a "substantial causative effect" on the delivery of that information.

Cazalas has been requesting the Volz letter from as early as March 7, 1981, when she met with Tyson in Washington. She had requested the letter explicitly in her March 19, 1981 letter to the Freedom of Information Appeals Unit. As late as August 3, 1981, EEO investigator Ray Saporito was denied a copy of the letter by the Executive Office for United States Attorneys. Cazalas did not receive the letter until September 11, 1979, when Susan Nellor appended it to her affidavit in lieu of the index that the magistrate ordered the government to produce. With respect to Morman's notes, Cazalas requested information about statements made by Judge Rubin and Judge Sear in her original request, although she did not explicitly refer to Morman until the March 19, 1979 letter. In the March 19, 1979 letter she also explicitly requested Morman's notes. Irrespective of her failure to mention Morman's notes specifically in the December 19, 1978 request, however, it is clear that Cazalas wanted from the outset these documents that con-

tained information about her difficulties with Judge Rubin and Judge Sear (see note 10). Cazalas did not receive these notes until late December 1979.

The government urges four arguments with respect to these two sets of documents in opposition to Cazalas's contention that she did, indeed, substantially prevail.

First, the government claims that the Volz letter was not in existence at the time of Cazalas's initial request, and that Cazalas did not exhaust her administrative remedies with respect to obtaining this letter. Although Volz's letter dated December 29, 1978 was not in existence when Cazalas made her December 19, 1978 request, we cannot accept the government's contention that the first time that Cazalas requested the letter was in her June 1979 complaint. Cazalas explicitly requested the letter in her March 19, 1979 appeal to the Freedom of Information Appeals Unit. If we understand the government's argument to be that because this new request was included in an appeal and not in the original request, so that therefore the time limits of 5 U.S.C. § 552 are not applicable, then we are unable to find statutory support for this contention.

■ The FOIA specifically provides that "[a]ny person making a request to any agency for records ... shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph." 5 U.S.C. § 552(a)(6)(C) (plural of provisions italicized by us). Preceding provisions of

---

**9.** The government states, and Cazalas admits, that she was given a "summary" of the Morman report. However, admitting that the record is very confusing, what both parties seem to refer to as a "summary" of the Morman report only summarizes the persons interviewed and the steps taken by the investigator. See Tr. 177. In her Rule to Show Cause and the memorandum in support thereof, Cazalas specifically complains that she had not received the "statements" of the witnesses listed, especially those of Judges Rubin and Sear. R. 175. This "summary" was apparently available to Acting Director Tyson by his March 22, 1979, memorandum, in which he reported to the Deputy Attorney General that the removal

of Cazalas as Assistant United States Attorney was justified, who relied in part upon the conclusions of the Department of Justice EEO investigator who "informally investigated" the complaint and found no sex discrimination. R. 478. We could find nowhere in the record before us that Cazalas was informed prior to the furnishing of the investigator's notes in December, 1979—after suit—of his informal summary of what Judges Rubin and Sear had told him concerning Cazalas's competence. If our study of the record has nevertheless resulted in oversight as to this circumstance, we are sure that the defendants will so inform us on application for rehearing.

that paragraph (paragraph 6) provide for the agency determination within ten days after the receipt of the initial request, § 552(a)(6)(A)(i), and within twenty days after receipt of any appeal, § 552(a)(6)(A)(ii). The statute expressly provides that administrative remedies shall be deemed to have been exhausted by agency denial or refusal to provide requested documents within the abbreviated time limits applicable to the initial requests and an administrative appeal, and it does not differentiate between whether the document is first specified on the initial request or amplified by the administrative appeal. It would be contrary to the intent of prompt response expressed by the statute to hold that the applicant had not exhausted his/her administrative remedies because he/she failed to make a new initial request but instead specified at the administrative appeal a document that was within the scope of the documents specified by the initial request (and was indeed a central thrust of the request, to ascertain to the formal and allegedly pretextual reasons upon which her superior recommended her discharge) but that was dated a few days later than the initial request.[10]

The time-limit provisions and the exhaustion of administrative remedy provision of 5 U.S.C. § 552(a) were the result of amendments to the Act proposed by the House. See H.R.Rep.No.93–876, 93d Cong., 2d Sess., *reprinted* [1974] U.S.Code Cong. & Ad.News 6267. The House amendment sought "to strengthen the procedural aspects of the Freedom of Information Act . . . in order to contribute to the fuller and faster release of information, which is the basic objective of the Act." *Id.* The House Report indicated unequivocally that "information is often useful only if it is timely" and that "excessive delay" by agencies made it necessary

that they "be required to respond to inquiries and administrative appeals within specific time limits." *Id.* at 6271. Further, it was the concern of the House amendments to make failure to meet those time limits tantamount to exhaustion of administrative remedies by the requestor. In conference, the 10- and 20-day administrative deadlines proposed by the House were adopted, as well as a Senate amendment that provided (not relevant to the present issue; see note 7) for a 10-day working day extension for "unusual circumstances." *See* Conf.Rep. No.93–1200, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad.News 6285, 6289. The statutory language proposed by the conference committee thus adopted the concept and purposes of providing speedy agency action with administrative exhaustion deemed applicable in the absence thereof, in order to contribute to the fuller and faster release of documents sought. The government's proposed hypertechnical construction is antithetical to that purpose clearly incorporated in the statutory language enacted.

The government thus knew from mid-March 1979, at the latest, that Cazalas wanted the crucial Volz letter, yet it failed to furnish the letter until some three months after suit was filed in June.

Second, the government applies the same argument to Morman's notes in that it claims that Cazalas did not exhaust her administrative remedies because she failed to request specifically the notes in her December 1978 letter. What Cazalas wanted was an opportunity to respond to certain statements that she attributed to Judge Rubin and Judge Sear. She *did* request any information about those statements in her original letter. She explicitly referred to Morman's notes in her March 19, 1979 let-

10. In arguing to the contrary, the government cites decisions holding that an FOIA requestant cannot claim a denial of documents requested under the Act that were not in existence at the time of the initial request. These decisions concerned the inability of a claimant to assert claims to future documents not yet on file, through a continuing interrogatory type of request. They do not concern an instance where (as here) the documents were unsuccessfully requested of the agency, either initially or on administrative appeal, but were in existence by the time of the administrative appeal and clearly implicated by the initial request. In the light of the express statutory provision cited in the text, these decisions are inapposite to the issue before us.

ter, and we are, therefore, also unable to accept the government's contention that Cazalas requested these documents for the first time in her FOIA complaint.

■ Third, the government argues that what Cazalas wanted were statements referred to by Morman in his EEO summary, and that no statements existed *"per se."* Rather, what existed were handwritten notes that Morman took at his interviews. We are unable to accept this argument. The government knew what Cazalas wanted and it is irrelevant whether they were labeled as "statements," "views," "expressions," or "opinions." The point is that Morman interviewed a number of persons, took notes on his interviews, and used the notes for further EEO investigating purposes. Requiring Cazalas to have to ask for Morman's paraphrasing of the statements of certain individuals would present the government with an airtight way of denying the existence of anything and everything that it wished to withhold by sometimes taping and transcribing an interview, sometimes taking notes during the interview, and sometimes recording the impressions of the interviewer at a later time, and then leaving it to the person requesting the documents to figure out for what to ask. In any event, Cazalas *did* ask for Morman's notes explicitly in her March 19, 1979 letter, and her initial request in December 1978 for all "memoranda," "reports," "records," "notations" in the relevant area of inquiry must certainly have alerted the government to the specific notations belatedly furnished to her by the government (see also note 9).

■ Fourth, the government relies on *Pope v. United States,* 459 F.Supp. 426, 429 (S.D.Tex.1977), *aff'd.* ("on the basis of" the district court opinion), 585 F.2d 802 (5th Cir. 1978), for the proposition that if the government supplies the majority of the requested documents voluntarily, then the complainant cannot be held to have substantially prevailed. The government, however, misreads the decision in *Pope. Pope* held that "the fact that Plaintiff received the majority of the documents sought through voluntary compliance by the Government does not mean that Plaintiff 'substantially prevailed.'" The *Pope* court went on to discuss other criteria for determining whether the plaintiff in that case substantially prevailed.[11] Actually, the government's assertion that a majority of the documents were released to Cazalas before the suit is factually questionable. The government released 111 or 112 pages of documents before suit, depending upon whether Tyson's initial release was, as Cazalas claims, of eighteen pages or, as the government claims, of nineteen pages. On April 13, 1979, Cazalas received 93 pages. After suit, Cazalas received 86 pages on September 21, 1979, 11 pages on November 20, 1979, and an undetermined number late in December, 1979. Nevertheless, as a matter of legal consequence, it may be irrelevant whether a majority of pages were released before or after, if indeed the government withheld until after suit the crucial or essentially important documents requested by the plaintiff, freely releasing pages and pages of trivia. In this case, the government withheld at least two highly significant documents until after Cazalas filed her complaint. The Volz letter and the Morman notes revealed with clarity the strength and character of the government's case for discharging Cazalas. They were more important to Cazalas than all other documents obtained in making her determination of whether to bring an employment discrimination action. If we accept the government's contention on its

---

11. The *Pope* district court held that whether the plaintiff in that case prevailed was determined by the four criteria that are used to determine whether the discretionary award of fees is applicable. In that sense, *Pope* confused two issues: whether the plaintiff substantially prevailed and whether, if so, attorney's fees should be awarded. *Pope* claimed to base its decision on *Kaye v. Burns,* 411 F.Supp. 897, 903 (S.D.N.Y.1976), but *Kaye* did not purport to blur the two issues. The rationale in *Pope* is, consequently, mistaken to the extent that it holds that whether a FOIA complainant substantially prevails is dependent upon the satisfaction of the four criteria discussed in that case. The *Pope* district court opinion on the test of "substantially prevailing" is contrary to that enunciated for this circuit by *Lovell v. Alderete,* 630 F.2d 428, 432 (5th Cir. 1980). *See* opinion, *supra.*

face, then the government could in any situation withhold the few "smoking gun" documents, but release all other documents and argue that the complainant did not substantially prevail if it had to give up that "smoking gun" as a result of the FOIA suit.

 In applying the correct standard of analysis to this situation, we find that Cazalas's FOIA complaint had a substantial causative impact on the release of the documents. The government exceeded severely the time limits for initial responses and appeals established in 5 U.S.C. § 552 without even attempting to argue that Cazalas's request presented "unusual circumstances" under 5 U.S.C. § 552(a)(6)(B).[12] The government's tactics of piecemeal revelation had the effect of frustrating the release of the documents sought by Cazalas and so apparently essential to the EEO use sought.

Having found that Cazalas "substantially prevailed," however, does not under the jurisprudence previously cited entitle her to attorney's fees. Such attorney's fees are awardable or not to an FOIA plaintiff who "substantially prevails" in his suit, but "[t]here is no presumption in favor of awarding attorney's fees in an FOIA case and such an award is left to the sound discretion of the district judge." *Chamberlain, supra,* 589 F.2d at 842 (5th Cir. 1979). Since the district court did not reach the issue of whether to exercise its discretion in accordance with the standards set out in *Lovell, supra,*[13] we remand the issue to the district court for the exercise of its sound discretion in the matter of attorney's fees.

*Conclusion*

We find that Cazalas substantially prevailed in her FOIA complaint against the government. We therefore VACATE the order of the district court denying attorney's fees, and we REMAND the case to it for further proceedings on the issue of at-

torney's fees consistent with the views expressed herein.

VACATED in part, and REMANDED.

---

12.  *See* note 7 *supra.*

13.  *Lovell, supra,* left open the question whether a *pro se* litigant could qualify for an award under the statute. In *Barrett v. Bureau of Customs,* 651 F.2d 1087, 1089 (5th Cir. 1981), we held that a *pro se* litigant could not get an award, but we did not decide whether an attorney who appears in *propria persona* would likewise be disqualified.