Concurrence by Judge Berzon;
Concurrence by Judge Murguia
ORDER
The opinion filed on August 25, 2017, and published at 869 F.3d 868, is amended as follows:
On page 49 of the slip opinion, within Judge Murguia’s opinion concurring in part and concurring in the judgment, add a footnote after the sentence “First Amendment Coalition failed to prevail primarily because of unilateral Government actions, outside its . control.” The footnote—new footnote, four—reads: “In her opinion, Judge Berzon suggests that my reasoning implies bad faith on the part of the government in this case. I am not aware of the circumstances surrounding the DOJ’s action, but the fact that the district court was not made aware of the White paper’s disclosure was critical for First Amendment Coalition’s inability to prevail on the merits and establish eligibility for attorney fees.”
With this amendment, Defendant-Ap-pellee's motion to amend the opinion and stay the mandate (Docket Entry No. 57) is DENIED as moot.
OPINION
BLOCK, District Judge:
In- September 2011, Anwar al-Awlaki,[1] an American citizen who had been targeted by the Central Intelligence Agency (“CIA”) as a terrorist, was killed in a drone attack in Yemen. This spawned parallel litigations under the Freedom of Information Act (“FOIA”) for the release of legal memoranda prepared by the Department of Justice’s (“DOJ”) Office of Legal Counsel (“OLC”) addressing the legality of the targeted killing of U.S. citizen terrorists. Plaintiff-appellant First Amendment Coalition (“FAC”) sued in the Northern District of California (“NDCA”), while—in consolidated litigation—the American Civil Liberties Union (“ACLU”) and the New *1122 York Times (“NY Times”) sued in the Southern District of New York (“SDNY”).
After the SDNY granted summary judgment in the Government’s favor, the Second Circuit reversed and ordered the release of one responsive OLC memorandum (“OLC-DOD memo”). Thereafter, the DOJ disclosed a second responsive memorandum (“OLC-CIA memo”) in the NDCA litigation. Nonetheless, the district court denied FAC’s request for attorney’s fees under FOIA.
We all agree—although for different reasons—that FAC is eligible for attorney’s fees. Accordingly, we REVERSE and REMAND to the district court to determine the fees to which FAC is entitled.[2]
I
More than a year prior to al-Awlaki’s death, two NY Times reporters, Scott Shane and Charlie Savage, submitted separate FOIA requests to OLC. Shane’s request, submitted in June 2010, sought “all Office of Legal Counsel opinions or memo-randa since 2001 that address the legal status of targeted killings, assassinations, or killing of people suspected of ties to Al-Qaeda or other terrorist groups by employees or contractors of the United States government.” New York Times v. United States Dep’t of Justice, 756 F.3d 100, 105 (2d Cir. 2014).
Savage’s request, submitted in October 2010, sought “a copy of all Office of Legal Counsel memorandum analyzing the circumstances under which it would be lawful for United States Armed Forces or intelligence community assets to target for killing a United States citizen who is deemed to be a terrorist.” Id.
FAC was the first to file a FOIA request after al-Awlaki’s death. On October 5, 2011, it asked the DOJ for “a legal memorandum prepared by OLC concerning the legality of the lethal targeting of Anwar al-Awlaki, an American-born radical cleric who, according to federal government officials, was killed September 30, 2011 in a U.S. drone strike in Yemen.” FAC alleged that “[t]he memorandum was the subject of a story (‘Secret U.S. memo sanctioning killing of Aulaqi’) in the September 30, 2011 Washington Post, in which multiple (albeit unnamed) administration officials discussed the memorandum and internal government debates on the legal issues addressed in it.”
Two days later, on October 7, 2011, the NY Times made another FOIA request, identical to the Savage request, and twelve days later, on October 19, 2011, the ACLU submitted FOIA requests to three agencies—DOJ, the Department of Defense (“DOD”), and the CIA—seeking various documents concerning the targeted killings of United States citizens in general, and al-Awlaki, his son, and another American citizen, Samir Khan, in particular.
All FOIA requests were met with resistance by the agencies; they were the subject of either a so-called “no number, no list” response or a so-called Glomar response.[3] Not surprisingly, FAC, the NY Times, and the ACLU sued. The NY Times was the first to strike. It initiated *1123 its action in the SDNY on December 20, 2011; the ACLU brought suit, also in the SDNY, on February 1, 2012, and the two cases were consolidated. FAC commenced its lawsuit in the NDCA later that month, on February 29, 2012.
On June 21, 2013, the DOJ issued a modified response to FAC’s FOIA request, “acknowledging the existence of one responsive OLC opinion pertaining to the Department of Defense”—the OLC-DOD Memo—but “refusing to confirm or deny the existence of responsive records related to any other agency.” A similar acknowledgment had previously been made a year before in the SDNY litigation by the OLC, DOD, and CIA.[4] See New York Times, 756 F.3d at 108; see also New York Times v. United States Dep’t of Justice, 915 F.Supp.2d 508, 519 (S.D.N.Y. 2013) (citing Declaration of John E. Bies, Deputy Assistant Attorney General, ¶ 30 (“Bies Deck”); Declaration of Robert E. Neller, Lt. General, United States Marine Corps, Director of Operations for the Joint Staff at the Pentagon, ¶ 17 (“Neller Dec!.”)). The OLC-DOD Memo was an “OLC opinion pertaining to the Department of Defense marked classified ... [t]hat ... con-tainted] confidential legal advice to the Attorney General, for his use in inter-agency deliberations, regarding a potential military operation in a foreign country.” New York Times, 756 F.3d at 112 (citing Bies Deck ¶ 30).
Despite acknowledging its existence, the Government refused to disclose the OLC-DOD memo—as well as any other related documents—in both litigations, claiming an assortment of FOIA exemptions and privileges.[5] Each district court granted the Government’s summary judgment motions. The SDNY decision came first, on January 3, 2013, and the NY Times and ACLU appealed to the Second Circuit. The NDCA decision came more than a year later, on April 11, 2014, while the Second Circuit appeal was sub judice.
In between the SDNY and NDCA decisions, there were a number of public disclosures that subsequently impacted the Second Circuit’s decision. As recounted by the circuit court,
[a]fter the [SDNY] entered judgment for the Defendants, one document and several statements of Government officials ... became publicly available. The document was captioned “DOJ White Paper” and titled “Lawfulness of a Lethal Operation Directed Against a U.S. Citizen Who Is a Senior Operational Leader of Al-Qaeda or an Associated Force”
*1124 (“White Paper”).[6] New York Times, 756 F.3d at 110. In the White Paper “the Government ma[de] public a detailed analysis of nearly all the legal reasoning contained in the OLC-DOD Memo,” which the Second Circuit had reviewed in camera. Id. at 116. As the circuit court noted, the White Paper had been “leaked to the press” on February 4, 2013—soon after the SDNY granted summary judgment for defendants—and it was subsequently “officially disclosed” four days later by the Office of Information Policy “in response to a FOIA request submitted by Truthout,” a nonprofit political news organization. Id. at 110n.9,116:
Based upon the release of the White Paper and the Government officials’ statements, the Second Circuit concluded that “waiver of secrecy and privilege as to the legal analysis in the [OLC-DOD Memo] ha[d] occurred.” Id. It accordingly ordered, inter alia, the disclosure of a redacted version of the OLC-DOD Memo, and submission to the district court of “other legal memoranda prepared by OLC ... for in camera inspection and determination of waiver of privileges and appropriate redaction.”[7] Id. at 124.
In so holding, the Second Circtiit paused to distinguish the NDCA’s decision denying FAC’s FOIA request for the OLC-DOD memo, even though that decision— unlike the SDNY’s—was rendered after the White Paper had surfaced. It believed that the NDCA had been “under the impression that.there ha[d] been no official disclosure of the White Paper,” and therefore, “did not assess its significance,” whereas before the circuit court, “the Government ha[d] conceded that the White Paper, with its detailed analysis of legal reasoning, ha[d] in fact been officially disclosed.”[8] New York Times, 756 F.3d at H6.
*1125 Not suíprisingly, FAC sought to vacate—by a timely motion for reconsideration—the NDCA’s order granting the DOJ’s motion for summary judgment. It also moved for attorney’s fees and costs.
The district court directed that before the Government filed its response to FAC’s motion, the parties should “meet and discuss whether the Second Circuit’s order that the DOJ disclose the OLC-DOD memorandum mooted the instant case.” Thereafter, on August 28, 2014, the parties submitted a joint status report, stating that “[o]n August 15, 2014, Defendant United States Department of Justice (‘Defendant’) released to Plaintiff First Amendment Coalition (‘Plaintiff) a second memorandum pertaining to a contemplated CIA operation against Anwar al-Aula-qi.” Jbint Status Report at 2, First Amendment Coalition v. United States Dep’t of Justice (N.D.C.A. 2014) (No. 12-1013) (emphasis added).[9] This second memorandum (“OLC-CIA memo”) was largely redacted but had concluded, as had the OLC-DOD memo, that “we do not believe the Constitution prohibits the proposed lethal action” that was being contemplated against al-Awlaki. Both memoranda were addressed to the Attorney General, but differed in two respects: The OLC-DOD memo, written on July 16, 2010, discussed the legality, under both the Constitution and federal criminal laws, of lethal' operations by the DOD and CIA against al-Awlaki. The OLC-CIA memo was written on February 19, 2010, six months earlier, and discussed only the constitutionality of lethal operations by the CIA against al-Awlaki.
The parties agreed that “these disclosures'resolved all substantive disputes in the case,” but “disagreed regarding whether the Court should vacate its summary judgment order and whether Plaintiff is entitled to attorneys’ fees.”
The district court vacated its summary judgment order, but held that based upon the parties’ concession that “no substantive issues remain,” the cáse had been rendered moot since the parties had decided “to abandon their right to' review.” In so holding, the court reasoned that “Plaintiff abandoned its right to pursue its. motion for reconsideration, to appeal this Court’s summary judgment order and to challenge the redactions to the OLC-DOD memorandum and the CIA memorandum,” And as for the defendant, “[n]ot only did. the government abandon its, right to seek en banc review in the Second Circuit or to file a petition for a writ of certiorari, it voluntarily disclosed the CIA memorandum to Plaintiff in this case....” (emphasis added). The district court then denied FAC’s motion for attorney’s fees because “Defen *1126 dant in this case released the documents largely as a result of the Second Circuit’s ruling in NY Times, not as a result of the ruling in this case.”
This appeal followed.[10]
II
“Because an award of fees under [FOIA] is discretionary, we review for an abuse of discretion. A trial court abuses its discretion when its decision is based on clearly erroneous factual findings or an incorrect legal standard.” United Ass’n of Journeymen & Apprentices of Plumbing & Pipefitting Indus., Local 598 v. Dept of Army Corps of Engineers, 841 F.2d 1459, 1461 (9th Cir. 1988) (abrogated on other grounds by United States Dep’t of Justice v. Reporters Comm. For Freedom of Press, 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989)) (citations omitted).
FOIA was enacted in 1966. “Without question, the Act is broadly conceived. It seeks to permit access to official information long shielded unnecessarily from public view....” Dep’t of Air. Force v. Rose, 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976). In other words, “the statute’s goal is ‘broad disclosure,’ and the exemptions [to disclosure] must be ‘given a narrow compass.’” Milner v. Dep’t of Navy, 562 U.S. 562, 131 S.Ct. 1259, 179 L.Ed.2d 268 (2011) (quoting Dep’t of Justice v. Tax Analysts, 492 U.S. 136, 151, 109 S.Ct. 2841, 106 L.Ed.2d 112 (1989)).
Congress passed substantial amendments in 1974, among them an attorney’s fees provision awarding fees and costs to a FOIA plaintiff who had “substantially prevailed.” 1974 Amendment to the Freedom of Information Act, Pub. L. No. 93-502, 88 Stat. 1561. The fees provision “has as its fundamental purpose the facilitation of citizen access to the courts to vindicate the public’s statutory rights,” and “‘a grudging application’ of the attorney fees provision ‘would be clearly contrary to congressional intent.’ ” Exner v. Fed. Bureau of Investigation, 443 F.Supp. 1349, 1351 (S.D. Cal. 1978) (citing Nationwide Building Maintenance, Inc. v. Sampson, 559 F.2d 704, 715 (D.C. Cir. 1977)), aff'd 612 F.2d 1202 (9th Cir. 1980). In keeping with FOIA’s broad reach, the statute contemplates that there may well be parallel litigation in different venues. See Taylor v. Sturgell, 553 U.S. 880, 903, 128-S.Ct. 2161, 171 L.Ed.2d 155 (2008); see also Smith v. Bayer Corp., 564 U.S. 299, 317, 131 S.Ct. 2368, 180 L.Ed.2d 341 (2011).
Congress did not provide any context to the cryptic “substantially prevailed” standard, but decisional law did. In Church of Scientology, we explained:
To be eligible for an award of attorney’s fees in a FOIA suit, the plaintiff must present convincing evidence that two threshold conditions have been satisfied. The plaintiff must show that: (1) the filing of the action could reasonably have been regarded as necessary to obtain the information; and (2) the filing of the action had a substantial causative effect on the delivery of the information.
700 F.2d at 489.
Although we did not specifically employ the word “catalyst,” we remanded to the *1127 district court to assess whether the plaintiff had substantially prevailed—and therefore was eligible for attorney’s fees—in light of the disclosure of a number of documents during the course of litigation before the complaint was dismissed. Church of Scientology, therefore, represented a “catalyst theory of recovery”; namely, an “alternate theory for determining the prevailing party if no relief on the merits is obtained.” Kilgour v. City of Pasadena, 53 F.3d 1007, 1010, as modified on denial ofreh’g (9th Cir. 1995). Thereafter, the catalyst theory was, for a number of years, consistently applied in FOIA fee award cases within the Ninth Circuit, and was similarly employed by our sister circuits both before and after Church of Scientology. See, e.g., Long v. I.R.S., 932 F.2d 1309 (9th Cir. 1991) (reciting Church of Scientology standard); Nationwide Bldg. Maint. Inc. v. Sampson, 559 F.2d 704 (D.C. Cir. 1977); Maynard v. C.I.A., 986 F.2d 547 (1st Cir. 1993); Vermont Law Income Advocacy Council v. Usery, 546 F.2d 509 (2d Cir. 1976);[11] Cazalas v. United States Dep’t of Justice, 660 F.2d 612 (5th Cir. 1981); Clarkson v. I.R.S., 678 F.2d 1368 (11th Cir. 1982).
In 2001, however, the Supreme Court rejected the application of the catalyst theory to the recovery of attorney’s fees under the Fair Housing Amendments Act and the Americans with Disabilities Act, holding that the theory would impermissi-bly “allow[] an award where there is no judicially sanctioned change in the legal relationship of the parties.” Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep’t. of Health & Human Res., 532 U.S. 598, 605, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). We then held, in Oregon Nat. Desert Ass’n v. Locke, 572 F.3d 610, 614 (9th Cir. 2009), that Buckhannon, by analogy, would also apply to FOIA and, therefore, abrogated our decision in Church of Scientology. But, as we explained in Locke, in 2007 Congress “modified FOIA’s provision for the recovery of attorney fees to ensure that FOIA complainants who relied on the catalyst theory to obtain an award of attorney fees would not be subject to the Buck-hannon proscription.” Id. at 615. Since then, the FOIA attorney’s fees statute has read:
(i) The court may assess against the United States reasonable ’ attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed.
(ii) For purposes of this subsection, a complainant has substantially prevailed if the complainant has obtained relief through either—(I) a judicial order, or an enforceable written agreement or consent decree; or (II) a voluntary or unilateral change in position by the agency, if the complainant’s claim is not insubstantial.
5 U.S.C. § 552(a)(4)(E).
Subsection (E)(i) is identical to FOIA’s earlier fee award provision. But subsection E(ii)(II), relevant to this appeal, expressly allows recovery based on “a voluntary or unilateral change in position by the agency, if the complainant’s claim is not insubstantial.” [12]
As we further explained in Locke, this new provision “addresse[d] a relatively *1128 new concern that, under [the prior statute], Federal agencies ha[d] an incentive to delay compliance with FOIA requests until just before a court decision [was] made that [was] favorable to a FOIA requester.” Id. (quoting 153 Cong. Rec. S15701-04 (daily ed. Dec. 14, 2007) (statement of Sen. Leahy, sponsor of the 2007 Amendments)). Section E(ii)(II) was.designed to clarify, therefore, “that Buckhcmnon does not apply to FOIA cases,”-since under that provision, “a FOIA requester can obtain attorney’s fees when he or she files a lawsuit to obtain records from the Government and the Government releases those records before the court orders them to do so.” Id.
We have not had an opportunity since the passage" of the 2007 amendment to decide whether it restores the causation standard under the catalyst theory applied in Church'of Scientology. But six circuit courts to have addressed the impact of the amendment have held that it simply reinstated the pre-Buckhannon catalyst theory of recovery. See Brayton v. Office of the United States Trade Representative, 641 F.3d 521 (D.C. Cir. 2011); Warren v. Colvin, 744 F.3d 841 (2d Cir. 2014); Havemann v. Colvin, 537 Fed.Appx. 142 (4th Cir. 2013); Batton v. I.R.S., 718 F.3d 522 (5th Cir. 2013); Cornucopia Institute v. United States Dep’t of Agriculture, 560 F.3d 673 (7th Cir. 2009); Zarcon, Inc. v. N.L.R.B., 578 F.3d 892 (8th Cir. 2009). In doing so, they have implicitly rejected the notion that subsection E(ii)(II) should be construed literally to allow for the recovery of attorney’s fees without the need to establish causation once there is a voluntary disclosure or change in position' subsequent to the initiation of FOIA litigation.
Judge Murguia and I believe that we should join our sister circuits in holding that, under the catalyst theory, there still must be a causal nexus between the litigation and the voluntary disclosure or change - in position by the Government. Thus, the plaintiff in this case had to present “convincing evidence” that the filing of the action “had a substantial causative effect on the delivery of the information.” Church of Scientology, 700 F.2d at 489.[13]
In doing so we explicitly reject the notion that the 2007 amendment eliminated the need to establish causation once a lawsuit has been initiated. The statute cannot plausibly be read that way. There may be a host of reasons why the Government has voluntarily released information after the filing of a FOIA lawsuit. One obvious example is that previously classified information may have subsequently become unclassified for reasons having nothing to do with the litigation, or “administrative compliance with statutory production requirements, rather than ... [the] FOIA suit triggered the release of the bulk of the documents.” Van Strum v. Thomas, No. 88-4153, 881 F.2d 1085, 1989 WL 90175, at *1 (9th. Cir. Aug. 2, 1989). Thus, as we recognized in Church of Scientology,, while it is true that “the mere fact that defendants have voluntarily released documents does not preclude an award of attorney’s fees to the’plaintiff,” it is equally true that “the mere fact that information sought was not released until after the lawsuit was instituted is insufficient to establish that a complainant has ‘substantially prevailed.’ ” 700 F.2d at 491-92 (citing with approval Cox v. United States Dep’t of Justice, 601 F.2d 1, 6 (D.C. Cir. 1979)).[14]
*1129 III
In Church of Scientology we remanded to the district court to make factual findings regarding three factors which a court should consider in determining whether the plaintiff had substantially prevailed: (1) “when the documents were released,” (2) “what actually triggered the documents’ release,” and (3) “whether [the plaintiff] was entitled to the documents at an earlier time.” Id. at 492.
Unlike Church of Scientology, there is no need to remand to determine eligibility since the undisputed material facts meet those criteria.[15] Pullman-Standard v. Swint, 456 U.S. 273, 292, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) (citing Kelley v. Southern Pacific Co., 419 U.S. 318, 331— 332, 95 S.Ct. 472, 42 L.Ed.2d 498 (1974)) (“[A] remand is the proper course unless the record permits only one resolution of the factual issue. All of this is elementary.” (emphasis added)).[16]
A. When the Document Was Released
.The NDCA litigation spanned almost two and a half years, from its inception on February 29, 2012 until the OLC-CIA memo was released on August 15, 2014. In Church of Scientology we embraced; the district court’s observation in Exner “that when information is delivered may be as important as what information is delivered.” 700 F.2d at 490 (citing Exner, 443 F.Supp. at 1353). We also noted the district court’s “support” in Exner for the requisite causal nexus “in that plaintiff faced formidable opposition by the government at every juncture,”, and “[i]t was unlikely, in the district court’s view, that the action would.have produced such favorable results, without the ‘dogged determination’ of plaintiff.” Id.
The same can be said of the present case. FAC was met with abject resistance throughout the entire litigation until the OLC-CIA. memo was produced roughly two and a half years after the lawsuit was initiated, and. almost a year and seven months after the Government waived any secrecy or privilege with the official release of the White Paper.
B. What Actually Triggered the Document’s Release
There is no question that the Second Circuit’s decision, in the SDNY litigation was an impetus for FAC to continue its litigation. But what actually triggered the release of the OLC-CIA memo was that FAC sought to vacate the district court’s grant of summary judgment. It was the appellant’s “dogged determination,” therefore, that led the district court to “direct” the parties to discuss whether the litigation was moot, and which resulted in the Government’s decision—as acknowledged by the lower court—to “voluntarily disclose[] the CIA memorandum to [FAC].” Because of FAC’s efforts, the public then *1130 learned that the OLC-DOD memo was not the first memo addressing the justification for the drone attack, nor was it identical to the prior OLC-CIA memo. Plaintiffs litigation, therefore, “triggered the release of additional or key documents.” Van Strum, 1989 WL 90175, at *1, 881 F.2d 1085.
C. Whether Plaintiff Was Entitled to the Document at an Earlier Time
There is no reason why the district court failed to recognize, as the Second Circuit did, that the official release of the White Paper—coupled with all the prior public statements of high-ranking Government officials—constituted a waiver of any secrecy and privilege that the Government had asserted. The district court, therefore, erred in granting summary judgment and dismissing the complaint. But for this error, the district court litigation would have ended earlier. Thus, FAC had to endure unnecessarily protracted litigation. It is counterintuitive to punish FAC for expending additional legal fees to pursue the litigation, when it would have sooner been entitled to the release of both memoran-da—and the right to recoup its counsel fees—if not for the district court’s error.
IV
In sum, the district court abused its discretion when it failed to consider and apply the relevant factors that we articulated in Church of Scientology for determining whether FAC had substantially prevailed. Its limited view of causation was at odds with Church of Scientology’s more enlightened view that, as here, multiple factors may be at play. It was, moreover, inconsistent with Congress’ intent—once again—that the award of FOIA counsel fees “has as its fundamental purpose the facilitation of citizen access to the courts,” and should not be subject to “a grudging application.” Exner, 448 F.Supp. at 1351— 52 (citing Nationwide Building, 559 F.2d at 715).
Since we have determined eligibility as a matter of law because there are no material facts in dispute, remand is required solely for the district court to determine the fees to which FAC is entitled.
REVERSED and REMANDED.

. This spelling is used by the district court and in the parties' briefs. We adopt if, except in some quotations in which the name is spelled "al-Aulaqi” or "al-Aulaki,”

. A determination of eligibility "does not automatically entitle the plaintiff to attorney's fees.” Church of Scientology v. United States Postal Serv., 700 F.2d 486, 489 (9th Cir. 1983). "Entitlement to attorney’s fees is left to the discretion of the district court.” Id.

. "A no number, no list response acknowledges the existence of documents responsive to the request, but neither numbers nor identifies them by title or description.” New York Times, 756 F.3d at 105. A Glomar response "neither confirms nor denies the existence of documents pertaining to the request.” Id.

. Unlike the NY Times and FAC, which only submitted FOIA requests to the OLC, the "ACLU submitted FOIA requests to three agencies: DOJ (including two of DOJ’s component agencies, [the Office of Information Policy] and OLC), DOD, and CIA,” New York Times, 756 F.3d at 106. Therefore, each agency was responsible for responding to the ACLU’s request, and all three "modified their original responses in light of statements by senior Executive Branch officials on the legal and policy issues pertaining to United States counterterrorism operations and the potential use of lethal force by the United States Government against senior operational leaders of al-Qaeda who are United States citizen's.” Id. at 105-07.

. In the SDNY action, the Government submitted Vaughn indices—filings identifying records withheld with explanations for why they were withheld—which identified unclassified documents, such as "an e-mail chain reflecting internal deliberations concerning the legal basis for the use of lethal force against United States citizens in a foreign country in certain circumstances” and "email traffic regarding drafts of the speech given by [Jeh] Johnson at Yale Law School and a speech delivered by Attorney General Holder at Northwestern University School of Law.” New York Times, 756 F.3d at 107.

. The "several statements of Government officials” to which the Second Circuit refers include John O. Brennan, "testifying before the Senate Select Committee on Intelligence on February 7, 2013, on his nomination to be director of CIA, [who] said, among other things, 'The Office of Legal Counsel advice establishes the legal boundaries within which we can operate.' ” New York Times, 756 F.3d at 111 (quoting Open Hearing on the Nomination of John O. Brennan to be Director of the Central Intelligence Agency Before the S. Select Comm, on Intelligence, 113 Cong. 57 (Feb. 7, 2013)). They also include a May 2013 letter Attorney General Eric Holder wrote to Senator Patrick J. Leahy, Chairman of the Senate ' Judiciary Committee, in which Holder stated that “[t]he decision to target Anwar al-Aulaki was lawful,...” Id,

. On June 30, 2014, in response to the Second Circuit’s mandate, Judge McMahon—the presiding SONY judge—ordered the Government to disclose for in camera review ”[u]n-redacted copies of the 'other legal memoran-'da prepared by OLC and at issue here’ ” within twenty-one days of the order. New York Times v. United States Dep’t of Justice, No. 11-9336 (S.D.N.Y. June 30, 2014) (order instituting circuit court mandate) (citing New York Times, 756 F.3d at 124). On July 9, 2014, Judge McMahon approved "a short postponement of the date by which the Government must produce the documente contemplated by the mandate” to August 15, 2014. New York Times v. United States Dep’t of Justice, No. 11-9336 (S.D.N.Y. July 9, 2014) (order approving postponement of in Camera lodging). The procedure for the in camera review "g[ave] the Government an opportunity to explain, under seal and in camera, why it ha[d] not waived potentially applicable privileges...." Id.

.The Second Circuit’s effort to distinguish the NDCA’s failure to order the release of the OLC-DOD memo because it believed that the district court was of the "impression” that it was not officially disclosed was charitable since, in addition to being officially disclosed to Truthout, the White Paper was also disclosed to the Senate Judiciary Committee, Senate Select Intelligence Committee, House Judiciary Committee, and House Permanent Select Committee on Intelligence. Moreover, in its memorandum in opposition to the Government’s summary judgment motion, FAC expressly advised the district court of the re *1125 lease of the White Paper and the various prior statements of the Government officials. See PL Opp. to MSJ at 2-4, 12, 21, First Amendment Coalition v. United States Dep’t of Justice (N.D.C.A. 2013) (No. 12-1013). The memorandum was filed on October 3, 2013, six months prior to the NDCA's decision of April 11, 2014, granting the Government's motion and dismissing the complaint. Specifically, FAC told the court that when it was released, “the President’s spokesman confirmed -that the White Paper was authentic, that it was the official position of the Government, and that it was adapted from classified memoranda which had been provided to Congress.” Id. at 3. The memorandum also alluded to the fact ,that the White Paper "along with .copious other pieces of official evidence” had previously "been submitted to the [district court.]” Id. at 4. .

. Deputy Assistant Attorney General Bies stated, in á written declaration,' that the Government also released on August 15, 2014 a redacted version of .the OLC-CIA memo to the NY Times and ACLU. "consistent with a cotart order from the [SDNY],” notwithstanding the SDNY’s order'that all documents be submitted in 'camera. Since the Government publicly disclosed the OLC-CIA memo in' the NDCA litigation, there was obviously no longer a reason to submit it for in camera review.

. In oral argument before this panel, Jonathan Segal, counsel for appellant, disclosed confidential information related to offers made by his opponent in mediation before the Ninth Circuit Mediation Program. This is in clear violation of Ninth Circuit Rule 33-1(c)(4), which states that any written or oral communication made in Ninth Circuit Mediation Program settlement discussions may not be disclosed to anyone who is not a participant in the mediation. The panel reiterates the importance of maintaining confidentiality in the Ninth Circuit Mediation Program. The wrongfully disclosed information was not considered in deciding the case.

. The district court in Exner embraced the catalyst theory language in Vermont Low Income, 443 F.Supp. at 1353. We conclusorily affirmed the result, simply commenting that ‘‘[t]he record supports both the findings and the court's conclusion,” Exner, 612 F.2d at 1207, but did not, until Church of Scientology, specifically adopt and apply the catalyst theory-

. The Government appropriately concedes that FAC’s claim was not insubstantial.

. Notably, "although we are not bound by their view of the law, the parties agree that the Church of Scientology causation standard applies, although they, of course, disagree as to its application in the present case.

. It is difficult to cohceptually square Judge Berzon’s "opinion that causation is irrelevant with the reality that the bringing of the litigation was itself a cause for what subsequently occurred. Causation, therefore, is very much *1129 in play, requiring the plaintiff to establish under the plain reading of the statute—both before and after the amendment—that it thereafter “substantially prevailed.”

. There may be other factors in a given case that may be relevant to whether the plaintiff had substantially prevailed, but these three factors clearly suffice in the present case.

. Judge Murguia does not join in Part III because she "do[es] not agree that the district court clearly erred in its causation finding.” Murguia Concurrence at 42, But reversal is required whenever a district court employs "an incorrect legal standard,” United Ass'n of Journeymen, 841 F.2d at 1461, and I believe, as explained in this Part, that the district court committed legal error in its cryptic causation conclusion by failing to recognize and apply the correct legal standard, namely the factors articulated in Church of Scientology.