**2020 WI App 61**

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.: 2019AP96

†Petition for Review Filed

Complete Title of Case:

**FRIENDS OF FRAME PARK, U.A.,**

      **PLAINTIFF-APPELLANT,**

  **V.**

**CITY OF WAUKESHA,**

      **DEFENDANT-RESPONDENT.†**

| | |
|---|---|
| Opinion Filed: | September 16, 2020 |
| Submitted on Briefs: | November 26, 2019 |

| | |
|---|---|
| JUDGES: | Neubauer, C.J., Gundrum and Davis, JJ. |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Joseph R. Cincotta* of Milwaukee. |
| Respondent ATTORNEYS: | On behalf of the defendant-respondent, the cause was submitted on the brief of *John M. Bruce* of *West & Dunn, LLC* of Two Rivers. |

COURT OF APPEALS
DECISION
DATED AND FILED

September 16, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP96**

STATE OF WISCONSIN

Cir. Ct. No. 2017CV2197

**IN COURT OF APPEALS**

---

FRIENDS OF FRAME PARK, U.A.,

PLAINTIFF-APPELLANT,

V.

CITY OF WAUKESHA,

DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for Waukesha County: MICHAEL O. BOHREN, Judge. *Reversed and cause remanded with directions.*

Before Neubauer, C.J., Gundrum and Davis, JJ.

¶1 DAVIS, J. This is a public records case involving a draft contract, exchanged between Defendant-Respondent City of Waukesha (the City) and a private entity, Big Top Baseball, LLC (Big Top), setting forth proposed terms under which Big Top's professional baseball team would play in a stadium to be

constructed in Waukesha's Frame Park. Plaintiff-Appellant Friends of Frame Park, U.A. (Friends), a community organization, was rebuffed in its attempt to obtain the draft contract from the City and sought a writ of mandamus. The City then released the record and, some months later, moved for summary judgment. The trial court granted the City's motion, reasoning that the City properly relied on a public records law exception to initially withhold the draft contract and that in any event, Friends' lawsuit did not cause the record's eventual release (i.e., Friends was not a "prevailing party" entitled to attorney fees). Friends now appeals.

¶2    At the outset, we acknowledge that the City voluntarily released the draft contract shortly after Friends filed suit. Ordinarily, where a party obtains the relief it seeks while litigation is pending, the case becomes moot. In public records cases, however, the relief sought typically includes more than the release of records—it also includes the requesting party's attorney fees. The public records statute allows fees to a requesting party who "prevails in whole or in substantial part." WIS. STAT. § 19.37(2)(a).[1] Thus the issue before us is whether Friends substantially prevailed in this action.

¶3    The test most often invoked to determine the prevailing party in a public records case is based on causation; it asks whether the lawsuit is "*a* cause, [if] not *the* cause, of the records' release." *WTMJ, Inc. v. Sullivan*, 204 Wis. 2d 452, 459, 555 N.W.2d 140 (Ct. App. 1996). Here, the City denies that the lawsuit caused the release. Instead, the City maintains, it released the record because the

---

[1]    All references to the Wisconsin Statutes are to the 2017-2018 version.

statutory exception it initially invoked (allowing records to be withheld for "competitive or bargaining reasons") no longer applied.[2]

¶4      We hold that where litigation is pending and an authority[3] releases a public record because a public records exception is no longer applicable, causation is not the appropriate inquiry for determining whether the requesting party has "substantially prevailed."  Rather, the key consideration is whether the authority properly invoked the exception in its initial decision to withhold release.  This result follows from the language of the statute, which requires compliance with a records request "as soon as practicable and without delay."  *See* WIS. STAT. § 19.35(4)(a).  A plaintiff with standing to seek a withheld record in a mandamus action should generally be considered to have "substantially prevailed" where it demonstrates a violation of this statute; that is, an unreasonable delay caused by the improper reliance on an exception.  In reaching this result, however, we must reconcile what, at least superficially, appears to be inconsistent language from prior decisions addressing how and whether a public records plaintiff can recover attorney fees following voluntary release during litigation.

¶5      Application of this rule leads us to reverse.  We hold that the City's reliance on the "competitive or bargaining reasons" exception was unwarranted and led to an unreasonable delay in the record's release.  Consequently, even if the lawsuit was not an actual cause of the release, Friends has "prevail[ed] in whole or

---

[2] This exception is set forth in WIS. STAT. § 19.85(1)(e), which allows for closed meetings under Wisconsin's open meetings law.  The public records law expressly provides that open meetings law exceptions may be invoked to withhold access to records.  WIS. STAT. § 19.35(1)(a).

[3] An "authority" is a specified governmental or quasi-governmental entity "having custody of a record."  WIS. STAT. § 19.32(1).

in substantial part" and is entitled to some portion of its attorney's fees, to be determined under the parameters set forth herein.

## Factual Background

¶6 Friends is a Wisconsin unincorporated association that formed in 2017 because its members—Waukesha citizens, property owners, and taxpayers—were interested in the City's purported plan to build and operate a baseball stadium in Frame Park in the City of Waukesha. One concern was that the City might contract with private entities, Big Top and Northwoods League Baseball (Northwoods League), to run the stadium and its baseball team. Big Top owned several baseball teams and operated another stadium in Wisconsin; the Northwoods League owned the league in which these teams played. Friends was interested in the details of the plan, such as how taxpayer funds would be used and to what extent Big Top would profit from the project.

¶7 On October 9, 2017, Friends submitted a public records request to Kevin Lahner, the City Administrator, seeking "any Letters of Intent … or Memorandum of Understanding … or Lease Agreements between Big Top Baseball and[/]or Northwoods League Baseball and the City of Waukesha during the time frame of 5-1-16 to the present time frame."[4] Two weeks later, the City attorney responded by letter, denying the request. The letter explained that "[a] park use contract with Big Top Baseball is presently in draft form." The letter then articulated two rationales, somewhat overlapping, for withholding this "draft contract." Both rationales relied on WIS. STAT. §§ 19.35(1)(a) and 19.85(1)(e).

---

[4] Friends had not formed at this point; rather, one of its eventual members made the public records request. The trial court found, and the City does not dispute on appeal, that Friends can be considered the public record requester for the purposes of this action. Therefore, for convenience, this decision refers to the record requester as "Friends."

Under § 19.35(1)(a), "any requester has a right to inspect any record," but exceptions to the open meetings law under § 19.85 may constitute grounds for denying access. Section 19.85(1)(e), in turn, permits closed meetings (and thus, potentially, nondisclosure of records) "whenever competitive or bargaining reasons [so] require."

¶8      The letter's first rationale for nondisclosure was that another entity was competing with the City for a baseball team:

> Because the contract is still in negotiation with Big Top, and there is at least one other entity that may be competing with the City of Waukesha for a baseball team, the draft contract is being withheld from your request …. This is to protect the City's negotiating and bargaining position.

The implication was that disclosure would either cause the City to lose the baseball team to the "other entity" referenced or force the City to contract on less favorable terms to secure the team.

¶9      A second, related rationale was that disclosure prior to the Waukesha common council review would hamper the City's ability to negotiate favorable terms within the draft contract:

> The draft contract is subject to review, revision, and approval of the Common Council before it can be finalized, and the Common Council have [sic] not yet had an opportunity to review and discuss the draft contract. Protecting the City's ability to negotiate the best deal for the taxpayers is a valid public policy reason to keep the draft contract temporarily out of public view …. There currently is a need to restrict public access for competitive and bargaining reasons until the Council has an opportunity to review the draft and determine whether it wants to adopt it or set different parameters for continued negotiations with the interested parties. If the contract's terms were made public, it would substantially diminish the City's ability to negotiate different terms the Council may desire for the benefit [of] the City.

The obvious implication was that the public could react to the draft contract in ways that might undermine the City's ability to negotiate the common council's preferred terms.

¶10 On December 18, 2017, Friends filed suit under WIS. STAT. § 19.37(1)(a), which permits a requester to "bring an action for mandamus asking a court to order release of the record" where "an authority withholds a record … or delays granting access to a record … after a written request for disclosure is made." Section 19.37(2)(a) further provides that "the court shall award reasonable attorney fees … and other actual costs to the requester if the requester prevails in whole or in substantial part in any action filed under [§ 19.37(1)(a)] relating to access to a record … under [WIS. STAT. §] 19.35(1)(a)."

¶11 The common council met the next day, on December 19. Council members had yet to view the draft contract, but it was anticipated that the contract would be shared and debated at the meeting. From our review of the record, however, it is unclear what (if anything) was actually discussed and decided on this topic. The meeting minutes merely state that there were "[c]itizen speakers registering comments against baseball at Frame Park"; that the "City Administrator's Report" included a "Northwoods Baseball League Update"; and that an "Item for next Common Council Meeting under New Business" was "Create an ADHOC Committee for the purpose to address Frame Park and Frame Park issues." There is nothing else in the record to indicate whether the common council saw, discussed, or approved the draft contract at the meeting.

¶12 On the following day, December 20, the City attorney e-mailed Friends and attached the draft contract. The parties do not dispute that this document was created by and shared among Big Top and City representatives in a

back-and-forth exchange.[5] The City attorney's e-mail explained that the document was "being released now because there is no longer any need to protect the City's negotiating and bargaining position."

¶13 Although Friends had now received the draft contract just two days after filing suit, the litigation continued, including with discovery and motion practice. Perhaps this is because the document was only one of several requested: Friends filed additional requests on December 8, 2017, and on January 25, February 2, and March 6, 2018. Friends also filed an amended complaint including some of these requests and addressing the impact of the City's December 20 disclosure of the draft contract. The amended complaint asserted that "[t]he City's subsequent production of the withheld records that it represented as responsive to the October 9th request does not eliminate the violation at issue, which was the improper withholding of records based on the assertion of an invalid or inadequate exception and justification, or otherwise." Friends asked the trial court to "declare whether the City's actions to withhold records in the face of the valid October 9, 2017 request was in violation of the Open Records law"; it also sought litigation costs and attorney's fees.

¶14 The City filed for summary judgment, claiming that the action was moot because the City had turned over all documents responsive to all of Friends'

---

[5] Neither party provided the draft contract to the trial court or included it in the record, although Friends submitted a copy in the appendix to its appellate brief. Such a submission was improper, and our decision does not rest on the substance of the draft contract but on other undisputed facts. For future reference we remind litigants that records at issue in a public records case generally should be provided to the trial court so that it can reach a fully informed decision. Even where the record has not already been disclosed, an in camera review can and in many cases should be undertaken, although it is not necessarily mandatory. *See State ex rel. Ardell v. Milwaukee Bd. of Sch. Dirs.*, 2014 WI App 66, ¶¶18-19, 354 Wis. 2d 471, 849 N.W.2d 894 ("[a]n *in camera* review of requested documents is not mandatory" in public records cases "if the policy reasons the custodian lists for nondisclosure are of sufficient specificity, and if those reasons override the presumption in favor of disclosure." (Citation omitted)).

requests. Friends' response focused on whether the draft contract, requested on October 9, 2017, had been timely provided; that is, whether the City correctly invoked WIS. STAT. § 19.85(1)(e) to delay the record's release until after the December 19, 2017 common council meeting. Friends submitted the deposition of Lahner, who was asked about the "other entity" or entities that "may be competing with the City of Waukesha for a baseball team," as referenced in the City attorney's letter. Lahner testified that "[t]here was another organization that was formed that wished to pursue a Northwoods League baseball team with the league, and it consisted of a different ownership group than the one that I was dealing with…. [O]ne of the primary proposers was an individual named Tom Kelneck."

¶15    Despite this assertion, on further questioning Lahner could not specify how this "Kelneck group" (as we term it) was competing with the City in a manner that might require withholding the draft contract. When asked, "Who w[as] [the Kelneck group] competing with?" Lahner replied, "I don't know." Our best surmise, based on the entirety of the transcript, is that the City at all relevant times was partnered with Big Top, and that the Kelneck group was a competitor of Big Top that may have been attempting to secure the same or another Northwoods League team for a different municipality. Regardless, any concern about competition appears to have been resolved by the time of the records request. According to an e-mail from Lahner to various City representatives, by "July/August" of 2017 the Northwoods League "had chosen Big Top Baseball as [its] preferred partner for a new team in [the Waukesha] area." At this point the City "began working through the negotiation process for a use agreement for Frame Park."

¶16    In his deposition, Lahner also discussed the City's second rationale for invoking the "competitive or bargaining reasons" exception: the purported need

for common council review prior to any public disclosure. Lahner again could not explain why drafts exchanged between the City and a third party (i.e., Big Top) could not immediately be shared with the common council (and thus, by the City's logic, the public). When asked point-blank how negotiations would have been impacted "[i]f the [common] [c]ouncil had been provided all the red lines [of the draft contract] on a sort of realtime or rolling basis or ongoing basis through the summer of [2017]," Lahner again responded, "I don't know." Nor could Lahner explain how disclosure could affect the City's bargaining position where Big Top itself was drafting and exchanging versions of the draft contract.

¶17 The trial court held that the City properly invoked the "competitive or bargaining reasons" exception of WIS. STAT. § 19.85(1)(e). The court's impression was

> that the city was negotiating with Bigtop Baseball, [and] didn't want to negotiate it, frankly, in public…. [The City did not want] to undermine what they might be doing with Bigtop Baseball or undermin[e] what the city may be doing with other entities involved with seeking a baseball establishment in one of the city parks.

The trial court was "satisfied" that the City attorney's letter outlined this rationale with the specificity required under WIS. STAT. § 19.35(1)(a). The court also clarified that it "read the exemption to mean the city was bargaining with Bigtop Baseball" and that "to do that type of discussion in the initial formation of the proposed contract is best done in a manner that is not public…. [T]hat's a matter for good public business …." Thus, in the trial court's view, the "competitive or bargaining" reasons exception "doesn't necessarily mean you're in competition with somebody else, although you could be."

¶18     The trial court next considered whether Friends was entitled to attorney's fees.  Although the parties did not brief this issue in any depth, the court noted the prevailing test:  a public records action is moot where the record is voluntarily disclosed, but the plaintiff may still recover attorney fees under WIS. STAT. § 19.37(2)(a) by showing that the action was a "substantial factor" contributing to the record's release.  *See WTMJ, Inc.*, 204 Wis. 2d at 458.  The trial court assumed that the Frame Park matter had been resolved at the December 19 common council meeting, "there being no contract or no agreement entered into with Bigtop."  Therefore, the court found that the City released the draft contract on December 20 not because of Friends' lawsuit but because there were no longer any "competitive or bargaining reasons" for nondisclosure.  For that reason, the court denied attorney's fees and dismissed the action in its entirety.  This appeal follows.

## Discussion

*Standard of Review and Public Records Law Principles*

¶19     Application of the public records law to undisputed facts is a legal question we review de novo.  *Zellner v. Cedarburg Sch. Dist.*, 2007 WI 53, ¶17, 300 Wis. 2d 290, 731 N.W.2d 240.  Similarly, under summary judgment standards, we review de novo whether there are genuine issues of material fact and whether a party is entitled to judgment as a matter of law.  *Chapman v. B.C. Ziegler & Co.*, 2013 WI App 127, ¶2, 351 Wis. 2d 123, 839 N.W.2d 425.

¶20     The public records law is a "fundamental concept[] in our state's history of transparent government," and the "clearly stated, general presumption of our law is that all public records shall be open to the public."  *Journal Times v. City of Racine Bd. of Police & Fire Comm'rs*, 2015 WI 56, ¶45, 362 Wis. 2d 577, 866 N.W.2d 563 (citation omitted).  This concept is reflected in the statute itself:

> [I]t is declared to be the public policy of this state that all persons are entitled to the greatest possible information regarding the affairs of government …. To that end [the public records law] shall be construed in every instance with a presumption of complete public access, consistent with the conduct of governmental business. The denial of public access generally is contrary to the public interest, and only in an exceptional case may access be denied.

WIS. STAT. § 19.31.

¶21 There are a variety of statutory and common law exceptions to the public records law, including those borrowed from the open meetings law, but we must strictly construe any public record exceptions in order to carry out the above-stated purpose. *See* WIS. STAT. § 19.35(1)(a); *see also **Hempel v. City of Baraboo***, 2005 WI 120, ¶¶58-59, 63, 284 Wis. 2d 162, 699 N.W.2d 551 ("Given the clear declaration of policy embodied in WIS. STAT. § 19.31, § 19.35(1)(a) must always be interpreted with that policy in mind."). This is also in keeping with the plain language of WIS. STAT. § 19.85(1)(e), the exception at issue here, which applies only where "competitive or bargaining reasons [so] *require*." (Emphasis added.) *See **State ex rel. Citizens for Responsible Dev. v. City of Milton***, 2007 WI App 114, ¶14, 300 Wis. 2d 649, 731 N.W.2d 640 ("The legislature's choice of the word 'require' … connotes its intent to limit the exception under § 19.85(1)(e) to those situations where the government's competitive or bargaining reasons leave no other option than to close meetings."). As should be evident, "the burden is on the governmental body to show that competitive or bargaining interests require closed sessions." ***City of Milton***, 300 Wis. 2d 649, ¶10.

*To Decide the Issue of Attorney Fees, We Must Determine Whether the City Properly Invoked WIS. STAT. § 19.85(1)(e)*

¶22 Because the City voluntarily disclosed the draft contract, the only consequence this appeal has to these parties is whether Friends is entitled to

attorney's fees. This is not the first time we have considered the question of attorney fees in what might otherwise be a moot case. In many (but not all) such cases we have treated this as a question of causation: Was the lawsuit a cause-in-fact of the record's release? We formulated this test in **Racine Education Association v. Board of Education for Racine Unified School District**, 129 Wis. 2d 319, 385 N.W.2d 510 (Ct. App. 1986). There, the School District made no answer to a public records request, so Racine Education Association (REA) brought a mandamus action. **Id.** at 323. The School District then invoked WIS. STAT. § 19.35(1)(*l*), under which an authority is not obligated to create a new record. **Racine Educ. Ass'n**, 129 Wis. 2d at 323. The School District further asserted that it was in the process of creating the requested records by extracting certain computerized information; eventually, it disclosed the record and claimed that the action was moot. **Id.** REA asked for attorney fees and costs. **Id.**

¶23 We agreed that the case was moot insofar as it concerned the release of the requested records; we also held that no exceptions to the mootness doctrine applied. **Id.** at 323-25. We determined, however, that under WIS. STAT. § 19.37(2), a plaintiff in REA's position could still "prevail[] in whole or in substantial part." **Racine Educ. Ass'n**, 129 Wis. 2d at 325. We looked to persuasive federal authority interpreting the Freedom of Information Act (FOIA), under which a plaintiff seeking public information may recover fees and costs where he or she "substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(i) (2018). We expressly adopted the following passage from the "landmark case" of **Cox v. United States Department of Justice**, 601 F.2d 1 (D.C. Cir. 1979):

> It is true that a court order compelling disclosure of information is not a condition precedent to an award of fees … but it is equally true that an allegedly prevailing complainant must assert something more than *post hoc, ergo propter hoc* …. Instead, the party seeking such

> fees in the absence of a court order must show that prosecution of the action could reasonably be regarded as necessary to obtain the information, and that a causal nexus exists between that action and the agency's surrender of the information. Whether a party has made such a showing in a particular case is a factual determination that is within the province of the district court to resolve. In making this determination, it is appropriate for the district court to consider, *inter alia*, whether the agency, upon actual and reasonable notice of the request, made a good faith effort to search out material and to pass on whether it should be disclosed…. If rather than the threat of an adverse court order either a lack of actual notice of a request or an unavoidable delay accompanied by due diligence in the administrative processes was the actual reason for the agency's failure to respond to a request, then it cannot be said that the complainant substantially prevailed in his suit.

*Racine Educ. Ass'n*, 129 Wis. 2d at 326-27 (citing to *Cox*, 601 F.2d at 6) (citations omitted). Because the test was "largely a question of causation," we did not consider whether there was a violation of the statute. *Racine Educ. Ass'n*, 129 Wis. 2d at 327-28. In fact, on appeal after remand, we declined to decide the "threshold issue" of whether the requested information even constituted a public record. *Racine Educ. Ass'n v. Board of Educ. for Racine Unified Sch. Dist. (Racine Educ. Ass'n II)*, 145 Wis. 2d 518, 520 n.2, 427 N.W.2d 414 (Ct. App. 1988). Instead, we decided that the requesting party was *not* entitled to fees because the lawsuit was not a cause of the release; rather, there was "an unavoidable delay accompanied by due diligence in the administrative processes." *Id.* at 524.

¶24 In the *Racine Education Association* decisions, our stated focus on the lawsuit as a cause-in-fact clearly dovetailed with our consideration of whether there was an unreasonable (as opposed to an unavoidable) delay in release. If we had determined that there *was* an unreasonable delay in that case, the outcome undoubtedly would have been different. Thus the *Racine Education Association*

decisions adopted causation as the test for prevailing-party status, but the application of that test was intertwined with the court's finding that there was no violation of the statute: the "cause" of the release was not the commencement of a lawsuit but the authority's prompt action once the records became available.

¶25 In any event, throughout the years we have continuously focused on causation, or what federal circuits term the "catalyst theory." *See*, *e.g.*, ***State ex rel. Vaughan v. Faust***, 143 Wis. 2d 868, 872-73, 422 N.W.2d 898 (Ct. App. 1988) (a requester "prevails in substantial part" when the record holder "voluntarily ceases an unexplained delay in making disclosure" following the institution of the mandamus action); ***State ex rel. Eau Claire Leader-Telegram v. Barrett***, 148 Wis. 2d 769, 773, 436 N.W.2d 885 (Ct. App. 1989) ("The test to determine whether a party has prevailed under [WIS. STAT. §] 19.37(2) is whether there is a causal connection between the litigant's mandamus action and the agent's compliance with disclosure."); ***WTMJ, Inc.***, 204 Wis. 2d at 459 (the lawsuit need only be "*a* cause, not *the* cause, of the records' release"); ***Journal Times v. City of Racine Bd. of Police & Fire Comm'rs***, 2014 WI App 67, ¶14, 354 Wis.2d 591, 849 N.W.2d 888 ("We remand to the trial court for a determination of whether this lawsuit was 'a' cause of the Commission's release of the responsive information, and if so, a determination of attorney fees and costs under WIS. STAT. § 19.37(2)."), *rev'd on*

*other grounds*, 2015 WI 56, ¶54, 362 Wis. 2d 577, 866 N.W.2d 563;[6] *see also* ***Brayton v. Office of the U.S. Trade Rep.***, 641 F.3d 521, 524-25 (D.C. Cir. 2011) (discussing the "catalyst theory").

¶26 Nonetheless, several cases focus on whether an unreasonable delay was caused by the authority's improper reliance on an exception under the public records law, regardless of the subsequent voluntary disclosure. For example, in ***Portage Daily Register v. Columbia County Sheriff's Department***, 2008 WI App 30, ¶8, 308 Wis. 2d 357, 746 N.W.2d 525, we noted that "the present appeal is not moot because our ruling will have the practical effect of determining the [plaintiff's] right to recover damages and fees under WIS. STAT. § 19.37(2)(a) based upon the [defendant's] denial of its request." (Footnote omitted.) And in ***State ex rel. Young***

---

[6] In ***Journal Times v. City of Racine Board of Police & Fire Commissioners***, 2015 WI 56, ¶54, 362 Wis. 2d 577, 866 N.W.2d 563, our supreme court did not have occasion to directly address this court's mandate remanding for a consideration of whether the lawsuit caused the release of information. This was because the supreme court disagreed with this court's conclusion that defendant's failure to provide information (as opposed to a record) could constitute a violation of the statute. *Id.* In so ruling, our supreme court cited ***Racine Education Association*** and ***Racine Education Association II*** and appears to have recognized that causation and the purported justification for delay in the release of records are intertwined:

> A requester who prevails "in substantial part" in such an action is entitled to "reasonable attorney fees, damages of not less than $100, and other actual costs…." WIS. STAT. § 19.37(2)(a). However, "[i]f the failure to timely respond to a request was caused by an unavoidable delay accompanied by due diligence in the administrative processes … the plaintiff has not substantially prevailed." Stated differently, if a custodian acts with reasonable diligence, a requester is not entitled to reasonable attorney fees, damages, and other actual costs under § 19.37(2) on grounds of unlawful delay.

*Journal Times*, 362 Wis. 2d 577, ¶57 (citations omitted). The court went on to discuss whether the requester had "substantially prevailed" in terms of both causation and whether the requester had prevailed in showing a violation. *Id.*, ¶86. ("The lawsuit was not causally related to the release of the record—the record was not in existence when the lawsuit was commenced or even served."); *id.*, ¶89 ("Precedent instructs us that, as public records litigation is concerned, the Newspaper has not prevailed in substantial part in this action because the Commission acted with reasonable diligence.").

*v. Shaw*, 165 Wis. 2d 276, 286-91, 477 N.W.2d 340 (Ct. App. 1991), we addressed the merits of the claimed violation at length in determining the requester's right to fees in an otherwise "moot" case.

¶27    In many, if not most, public records cases, it may not matter much whether "prevailing party" status turns on causation or on the mere fact of a statutory violation.  After all, where a party inexcusably delays in releasing records to a point that prompts litigation, it can typically be inferred that the lawsuit was at least "a" cause of the release.  *See* ***WTMJ, Inc.***, 204 Wis. 2d at 459 ("[I]n an open records case, causation is often an inference drawn from documentary or undisputed facts.").  But that cannot always be the inference, particularly where the authority expressly relies on a time-limited exception.

¶28    Here, for example, the City unquestionably delayed the release of the requested record, prompting a lawsuit.  It only released the document because, in its view, the December 19, 2017 common council meeting eliminated any "competitive or bargaining" justification for nondisclosure.[7]  A strict causation analysis in this context could lead to absurd results.  Assume that the trial court held (as we hold, *infra*) that Friends should have received the draft contract upon its request.  Friends' entitlement to attorney's fees would then hinge entirely on the fortuity of when that

---

[7] We do not, however, find that the occurrence of the common council meeting was (or was not) the cause of the public record release.  Indeed, notwithstanding the trial court's conclusion, we believe that this question would likely require further factual inquiry.  *See* ***Eau Claire Press Co. v. Gordon***, 176 Wis. 2d 154, 160-61, 499 N.W.2d 918 (Ct. App. 1993) (discussing the standard for the trial court's factual findings as to causation).  The record does not clarify what, if anything, occurred at the common council meeting with regard to the draft contract.  Further, Friends argues to this court that contrary to the trial court's assumption, the Frame Park matter was not resolved until sometime in 2018 (the fact that the common council created a Frame Park "ADHOC Committee" for "next Common Council Meeting under New Business" supports this point).  Because we decide this case on the merits, however, we do not have to determine whether remand would have been appropriate as to whether Friends is entitled to attorney's fees under a pure causation or "catalyst" theory.

ruling was made. That is, if the ruling happened before the common council meeting, then Friends would succeed on the merits and be entitled to fees (along with costs and any damages) pursuant to WIS. STAT. § 19.37(2)(a). If the common council meeting happened first, then Friends would *not* be entitled to attorney's fees because the meeting, rather than the court's order, would have to be considered the cause of the release.

¶29 We do not view the law as compelling such a result. In fact, as these alternative scenarios illustrate, application of a causation analysis in all cases would likely thwart the goal of our public records law: to provide "*timely* access to the affairs of government," **WTMJ, Inc.**, 204 Wis. 2d at 457 (citation omitted), "as soon as practicable and without delay," *id.* (quoting WIS. STAT. § 19.35(4)). After all, "the purpose of [WIS. STAT. § 19.37(2)(a)] is to encourage voluntary compliance; if the government can force a party into litigation and then deprive that party of the right to recover expenses by later disclosure, it would render the purpose nugatory." **Racine Educ. Ass'n**, 129 Wis. 2d at 328. Where the delayed release is based on an event that terminates an exception that arguably never should have been invoked in the first place, the need to address the merits of that exception becomes compelling.

¶30 This discussion is not meant to be entirely dismissive of causation, particularly given the significant precedent on which it is based. Rather, we seek to clarify the application of that test where, as here, an authority claims that the expiration of a public record exception, rather than the requester's lawsuit, was the reason for what would otherwise be an unreasonable delay in the release of a record. As we did in **Racine Education Association** and **Vaughan**, we turn to persuasive

17

federal authority interpreting FOIA. *See Racine Educ. Ass'n*, 129 Wis. 2d at 326-28; *Vaughan*, 143 Wis. 2d at 872-73.[8]

¶31 We do not have to look far. In the widely cited case *Church of Scientology of California v. United States Postal Service*, 700 F.2d 486, 489-92 (9th Cir. 1983),[9] the Ninth Circuit, with reference to *Cox*, discussed the familiar framework for determining whether a plaintiff is eligible for attorney fees following voluntary disclosure. After reiterating the *Cox* standard—a party must show "that the lawsuit was *reasonably necessary* and that it had a *substantial causative effect* on the release of documents"—the court remanded to the district court to:

---

[8] We recognize that our reliance on FOIA cases even as persuasive authority must come with caveats. In particular, although the "substantially prevailed" language in FOIA's fee-shifting provision is functionally equivalent to the language of WIS. STAT. § 19.37(2)(a) (awarding fees where the requester "prevails in whole or in substantial part"), unlike the case with our statute, entitlement to fees under FOIA is not mandatory upon a finding that the plaintiff has "substantially prevailed." Rather, under FOIA, the "substantially prevailed" inquiry merely means that a plaintiff is *eligible* to recover fees. Upon a finding of eligibility, the court must conduct further analysis to determine actual *entitlement* to fees. *See*, *e.g.*, *Davy v. CIA*, 550 F.3d 1155, 1158-59 (D.C. Cir. 2008) (factors establishing entitlement include the benefit to the public derived from the suit, commercial benefit to the plaintiff, nature of the complainant's interest, and whether the agency had a reasonable legal basis for withholding the records). Nonetheless, persuasive federal authority is instructive as to the application of the "causal nexus" test, which, after all, we borrowed from federal case law in previous cases.

[9] In *Oregon Natural Desert Association v. Locke*, 572 F.3d 610, 614-15 (9th Cir. 2009), the Ninth Circuit recognized that the United States Supreme Court limited application of the catalyst theory in a manner that might extend to FOIA claims. *See Buckhannon Bd. & Care Home, Inc. v. West Va. Dep't of Health & Human Res.*, 532 U.S. 598 (2001). The Ninth Circuit pointed out, however, that a 2007 amendment to FOIA "modified FOIA's provision for the recovery of attorney fees to ensure that FOIA complainants who relied on the catalyst theory to obtain an award of attorney fees would not be subject to the *Buckhannon* proscription." *Locke*, 572 F.3d at 615. In *First Amendment Coalition v. United States Department of Justice*, 878 F.3d 1119, 1128 (9th Cir. 2017), the Ninth Circuit noted, "We have not had an opportunity since the passage of the 2007 amendment to decide whether it restores the causation standard under the catalyst theory applied in *Church of Scientology*," but that six other circuit courts held that the amendment did so. Two judges on the *First Amendment Coalition* panel would have joined those sister circuits, while the third interpreted the amendment to FOIA as removing the causation element entirely. *First Amendment Coal.*, 878 F.3d at 1128, 1130-31. All this is to say that *Church of Scientology*, although arguably abrogated on other grounds, continues to be cited favorably and retains persuasive value with respect to the application of the catalyst theory.

consider the following factors in determining whether the Church has substantially prevailed: (1) when the documents were released; and (2) what actually triggered the documents' release to the Church; and (3) *whether the Church was entitled to the documents at an earlier time in view of the fact that the exemption [upon which the Postal Service initially relied] was eliminated.*

*Church of Scientology*, 700 F.2d at 491, 492 (emphasis added). The court explained that "[i]f the Church was entitled to a substantial number of the 615 pages of documents that were subsequently released, *regardless of the Postal Service's eventual decision that the documents were not required for its investigations due to the passage of time*, the Church *must* be considered as having prevailed." *Id.* at 492 n.5 (emphasis added).

¶32 Just as *Church of Scientology* arguably refines the *Cox* test previously adopted by this court, so too do we rely on that case to clarify our decisions in *Racine Education Association*, *WTMJ, Inc.*, and other cause-focused cases, and reconcile them with *Portage Daily Register* and *Young*. The three-factor test set forth in *Church of Scientology* allows for a more flexible inquiry, one that permits consideration of factors other than causation.

¶33 The test to some degree requires discretionary determinations by the trial court, and which factor controls necessarily depends on the circumstances. The first factor, the timing of the disclosure, will generally come into play where there is a brief, inconsequential delay in providing records. In such a situation, the fact that a lawsuit may have been filed should not necessarily entitle the requester to fees. The second factor, causation, should most often apply in situations involving an authority that is alleged to be dragging its feet without any perceptible justification for delay, similar to what was argued (unsuccessfully) in *Racine Education Association II* and (successfully) in *WTMJ, Inc.* If a lawsuit becomes

necessary to, and does, trigger compliance, that fact alone should usually be sufficient to permit a fee award. The third factor—whether the requester was entitled to the record at an earlier time—should control where a delay in a voluntary release can be attributed to the authority's reliance on a public records exception. Where that is the case the trial court must scrutinize the claimed exception, rather than whether the lawsuit caused the release, to determine whether a requesting party has prevailed in whole or in substantial part.[10]

¶34    Here, there can be no question that the City withheld the draft contract on the claimed basis that a public records exception required nondisclosure; it later released the contract because it believed there was no longer a "competitive or bargaining" rationale to continue withholding it. There also is no doubt that the delay in disclosing this document—in excess of two months, and during a period in which Friends seemingly would be interested in making its views known to the relevant public officials—was not insignificant and the triggering event (according to the City) was the expiration of the exception on which nondisclosure was based. In other words, this unquestionably was *not* a situation in which an authority was simply dragging its feet, which might allow the court to conclude that a lawsuit was necessary to bring the foot-dragging to an end. Rather, Friends' claim for attorney's fees must hinge on whether the City appropriately invoked WIS. STAT. § 19.85(1)(e) to withhold disclosure until after the December 19 common council meeting. We therefore turn to a discussion of that exception.

---

[10] Although this holding arises out of both the need to reconcile our precedent and simple logic, we also foresee a merits-based analysis being simpler to apply and thus reducing litigation costs to a greater degree than would be the case were we to place exclusive reliance on causation. The United States Supreme Court in **Buckhannon** was critical of the catalyst theory for this very reason, noting that it often involves a "highly factbound inquiry" into "defendant's subjective motivations in changing its conduct." **Buckhannon**, 532 U.S. at 609. The difficulty in determining causation in the present case is a case in point. *See supra* note 7.

*The City's Decision to Withhold the Draft Contract was Not Justified By the "Competitive or Bargaining Reasons" Exception in* WIS. STAT. *§ 19.85(1)(e)*

¶35    Pursuant to Wisconsin's public records law, "any requester has a right to inspect any record." WIS. STAT. § 19.35(1). As discussed above, exceptions to the open meetings law may be grounds for withholding a public record; the exception at issue here permits closed meetings (and thus, nondisclosure of records) for "[d]eliberating or negotiating the purchasing of public properties, the investing of public funds, or conducting other specified public business, whenever competitive or bargaining reasons [so] require." WIS. STAT. § 19.85(1)(e); *see also* § 19.35(1)(a).

¶36    The public record and open meetings statutes do not define the phrase "competitive or bargaining reasons," and only two Wisconsin cases provide any real guidance.[11] Both cases deal specifically with the open meetings law. In *State ex rel. Herro v. Village of McFarland*, 2007 WI App 172, ¶¶1-2, 303 Wis. 2d 749, 737 N.W.2d 55, the meetings at issue concerned boundary disputes between the Village of McFarland and the Town of Dunn. The Town requested that portions of the meetings be closed, pursuant to WIS. STAT. § 19.85(1)(e): it was negotiating with private citizens (the Sperles) to purchase their property, but in a concession to the Village, it was also willing to allow the Village to annex a portion of the town that included the Sperles' property. *Herro*, 303 Wis. 2d 749, ¶3. The Town's fear was that "if the Sperles knew the concessions it was willing to make to the Village,

---

[11] A third case, *State ex rel. Journal/Sentinel, Inc. v. Pleva*, 151 Wis. 2d 608, 616, 445 N.W.2d 689 (Ct. App. 1989), *aff'd*, 155 Wis. 2d 704, 456 N.W.2d 359 (1990), stands for the principle that the public entity may not "[m]erely stat[e] that the meetings would involve competitive or bargaining issues [in] a blanket approach [to] closing such committee sessions," but must "establish the nature of the items to be discussed in the meetings so as to justify the … vote for closure." Although the City argues otherwise, the issue here is not whether the City invoked WIS. STAT. § 19.85(1)(e) with sufficient specificity but whether the City met its burden of showing that this exception applied. Therefore, *Pleva* does not aid our analysis.

they would stop negotiating with the Town and approach the Village instead." ***Id.***, ¶4. Essentially, the Town sought "to protect its bargaining position with the Sperles." ***Id.***, ¶15. Without any detailed analysis, we assumed that a closed meeting would protect the Town's bargaining position and also assumed that protecting the Town's bargaining position was sufficient justification for invoking the statutory exception. ***Id.***, ¶¶15-19.

¶37 ***City of Milton*** presents the only in-depth treatment of this exception, and it is highly instructive. There the City of Milton invoked WIS. STAT. § 19.85(1)(e) to justify holding ten closed meetings, during which Milton representatives discussed United Cooperative, L.L.C.'s (United Coop's) interest in building an ethanol plant in Milton. ***City of Milton***, 300 Wis. 2d 649, ¶1. Those meetings concerned internal "discussions about negotiating with United Coop to build an ethanol plant in Milton, negotiating to purchase land from Doug Goodger as a site for the plant, possible problems associated with having an ethanol plant in the community, and other possible projects for Milton's Industrial Park." ***Id.***, ¶2.

¶38 The trial court held that there was no violation of the open meetings law. ***Id.***, ¶3. We reversed. ***Id.***, ¶19. We examined Milton's reasons for closing the meetings, including:

> (2) United Coop had proposed constructing an ethanol plant in Milton, and had requested confidentiality throughout the negotiation process; (3) for part of the negotiation process, Milton was also engaged in negotiation for purchase of private property from Doug Goodger which United Coop sought to purchase for the ethanol plant site; (4) Milton wanted its negotiations with United Coop to remain confidential so that another municipality would not pursue negotiations with United Coop; (5) Milton did not want to disclose its negotiating position to United Coop; and

(6) any agreement reached in closed session would have contingencies for public input at a later date.[12]

*Id.*, ¶11. We found most of these reasons unpersuasive. Regarding the second reason, we held that standing alone, "a private entity's desire for confidentiality [throughout the negotiation process] does not permit a closed meeting." *Id.*, ¶13. Although "such a request might provide a reason for a government to *desire* holding closed meetings, that request does not *require* the government to hold closed meetings to preserve the government's competitive or bargaining interests." *Id.*, ¶14 (emphasis added).

¶39 The third and fourth reasons for closing the meetings rested on Milton's desire to avoid competition on two different fronts: from some other party who might wish to purchase the land on which the plant would be built (reason three) and from another municipality that might wish to lure United Coop and its ethanol plant away (reason four). *Id.*, ¶¶15-17. We held that these were not appropriate justifications under WIS. STAT. § 19.85(1)(e), since the other party remained free to seek more competitive offers regardless of whether the meetings were closed. *City of Milton*, 300 Wis. 2d 649, ¶¶15-17. We further held that

> even if secrecy somehow deterred competition from other municipalities, it is not apparent that such a reason would support holding closed meetings. All Wisconsin municipalities are governed by Wisconsin's Open Meetings Law. There is no reason to believe that the free market does not work for ethanol plant siting, resulting in the lowest cost for the ultimate consumers. Permitting the governed to express opinions about prospective purchases may be time consuming, frustrating, counterproductive and might increase costs. But the Wisconsin legislature has decided that complete information regarding the affairs of government is the policy of Wisconsin. We cannot accept the

---

[12] Reason (1), that Milton had invested heavily to attract United Coop's business, was implicitly rejected by the court and in any case is not relevant to our inquiry. *See State ex rel. Citizens for Responsible Dev. v. City of Milton*, 2007 WI App 114, ¶¶11-19, 300 Wis. 2d 649, 731 N.W.2d 640.

proposition that a governing body's belief that secret meetings will save costs justifies closing the door to public scrutiny.

*Id.*, ¶17.

¶40 In addition, we held that reason six—that the public could weigh in on the agreement at a later date—did not justify a closed meeting:

> Milton has cited no authority, nor have we discovered any, allowing an exception to the requirement of open meetings on the basis of the opportunity for future public input. That Milton fears the possible disruption of its plans is no reason to avoid public debate through secret meetings. Indeed, contentious issues are those most in need of public discussion.

*Id.*, ¶18. We did determine, however, that reason five (preventing disclosure of Milton's negotiation strategy) could justify invoking this exception and that portions of the meetings that would have revealed that strategy could be closed. *Id.*, ¶19. We reasoned that "[d]eveloping a negotiation strategy or deciding on a price to offer … is an example of what is contemplated by 'whenever competitive or bargaining reasons require a closed session.'" *Id.*

¶41 At first glance, *Herro* appears to slightly contradict *City of Milton*, since the effect of closing the meetings in *Herro* was to deter a private party from negotiating a better deal with a different governmental entity. *Herro*, 303 Wis. 2d 749, ¶¶4, 19. In *Herro*, however, that deterrence was tied to protecting the Town's negotiation strategy, by preventing the release of confidential or "inside information" (concessions the Town might make to the Village). *Id.*, ¶4. This is fully in keeping with *City of Milton*. *City of Milton*, 300 Wis. 2d 649, ¶¶15-19. Therefore, *Herro* and *City of Milton* can be synthesized to create some general principles for the application of WIS. STAT. § 19.85(1)(e). Section 19.85(1)(e) can certainly be invoked to prevent disclosure of a negotiation strategy or other "insider information" that is not available to one party in a negotiation. Section 19.85(1)(e)

cannot, however, be invoked merely because a private entity desires confidentiality; because the public will later have the opportunity to provide input; or to prevent competition where the other side remains free to negotiate with potential competitors. In addition, there are public policy reasons why § 19.85(1)(e) should not generally be used to prevent competition among governmental entities, as this could harm both consumers and those citizens interested in the workings of their government.

¶42 Applying these principles, we conclude that the "competitive or bargaining reasons" exception of WIS. STAT. § 19.85(1)(e) did not justify withholding the draft contract at the time of the October 9, 2017 request.

¶43 The City's first stated reason for not releasing the draft contract was that it could suffer competitive harm if the document were disclosed. This document, however, was marked up and exchanged among City and Big Top representatives in a succession of back-and-forth edits. To state the obvious, then, any harm from disclosing this document could not relate to the City's negotiating strategy with respect to Big Top.

¶44 Nor has the City shown that it would have suffered any *other* type of competitive harm had it made the contract available to a member of the public in October 2017. Although the City asserts that another "entity" was competing with it, the evidence shows that the only competition was from one or more business groups that may have been working to locate a Northwoods League team in a different municipality. Recall that at one point "a different business group had reached out to the Northwoods League"; however, by "July/August" (months before the public records request) the Northwoods League had decided to partner with Big Top and locate a team in Waukesha. If this "different business group" was the

25

Kelneck group of Lahner's deposition (which seems likely), then by the time of the request, no other business group was competing with the City. Even if this "different business group" was *not* the Kelneck group, there is still no evidence that some other group was competing with the City by October 2017. Thus the City has not shown that it was "competing" with *any* entity, public or private, for a contract or partnership with Big Top or the Northwoods League as of the October 2017 public records request or during the two months thereafter.

¶45 In any event, under *City of Milton*, "it is not apparent that" governmental entities can use WIS. STAT. § 19.85(1)(e) to shield themselves from competition with other governmental entities. *City of Milton*, 300 Wis. 2d 649, ¶¶15, 17. Thus, even if the City were worried about losing the baseball team to another municipality (and, again, there is no evidence that this was the case), it is doubtful that § 19.85(1)(e) would have applied under existing precedent. Furthermore, in *City of Milton* we found § 19.85(1)(e) inapplicable where, as here, the other party to the negotiation remained free to seek the best deal from any available partner. *City of Milton*, 300 Wis. 2d. 649, ¶¶15-16. Thus *City of Milton* undercuts the City's first rationale for nondisclosure.

¶46 The City's second justification—that the draft contract required common council review before release—fares no better. In his deposition Lahner could not clarify how nondisclosure prior to common council review could create any competitive advantage for the City. For example, when asked how public disclosure during the spring and summer of 2017 could have affected the City's bargaining position, Lahner replied, "I don't know." Thus, the City has not met its burden of showing that "competitive or bargaining reasons *require[d]*" nondisclosure. WIS. STAT. § 19.85(1)(e) (emphasis added); *City of Milton*, 300 Wis. 2d 649, ¶14.

26

¶47   At least generally speaking, *City of Milton* further undermines the City's second rationale as well.  *City of Milton* prohibits a municipality from invoking WIS. STAT. § 19.85(1)(e) to "save costs" or otherwise prevent "the possible disruption of its plans."  *City of Milton*, 300 Wis. 2d. 649, ¶¶17-18.  This suggests that even if nondisclosure prior to common council review would have streamlined negotiations by, say, avoiding public dissent, § 19.85(1)(e) still might not apply.  Nor, under *City of Milton*, would the City be justified in temporarily withholding the draft contract until the common council meeting on the grounds that the contract would be available sometime thereafter.  There is "no authority [for] allowing an exception to the requirement of open meetings on the basis of the opportunity for future public input."  *City of Milton*, 300 Wis. 2d. 649, ¶17.  Finally, to the extent nondisclosure was meant to accommodate Big Top's interests, *City of Milton* is clear:  in and of itself, "a private entity's desire for confidentiality does not permit" nondisclosure under § 19.85(1)(e).  *City of Milton*, 300 Wis. 2d. 649, ¶13.

¶48   In making these observations, we emphasize that pursuant to *City of Milton* and *Herro*, the City undoubtedly could have relied on WIS. STAT. § 19.85(1)(e) had it been able to show that disclosure prior to common council review would have impeded its negotiation strategy.  The City, however, did not and probably could not meet this burden.  Again, this is because this particular draft contract *was created by the City and Big Top together*.[13]

---

[13] It is undisputed that the City, Big Top, and Northwoods League would have been signatories to the final contract.  It is unclear to what extent the Northwoods League was responsible for negotiating the terms of the draft contract, although it appears that the draft contract was primarily a product of Big Top and the City.  There is no evidence, however, that the City and Big Top together were creating a confidential document that would have revealed a negotiation strategy with respect to the Northwoods League.  As discussed, there is also no evidence that either Big Top or the City was entertaining negotiations with any other entity.  Therefore, there is no evidence that disclosing the draft contract would have revealed a negotiation strategy or any other information that was not already known to all the pertinent parties.

¶49     The City nonetheless maintains that WIS. STAT. § 19.85(1)(e) applies because "[m]eeting in closed session … was necessary to prevent those with whom the City was negotiating from learning of the Common Council's reactions to proposed terms, preferences, willingness to accept alternatives, and other matters which would put the City at a disadvantage in the bargaining process."  The problem with this argument is that Friends was not seeking access to a *meeting*—it was simply seeking disclosure of a *document* that might be discussed at that meeting.  By itself, the document could reveal nothing about internal reactions or negotiating strategies.

¶50     Although it is unclear from the meeting minutes, we assume without deciding that those portions of the December 19 meeting concerning the "Common Council's reactions" were properly closed—the trial court's statement about not wanting to "negotiate a contract in public" is a point well taken.  It does not follow, however, that the City was justified in withholding all documents under discussion.  The distinction may be a fine one but it is nonetheless important.  The need to negotiate, and to form a strategy for negotiating, a contract in private is one thing; withholding all documents relating to those negotiations, so as to deprive the public of the ability to provide any input whatsoever, is quite another.  WISCONSIN STAT. § "19.35(1) does not mandate that, when a meeting is closed under [WIS. STAT.] § 19.85, all records created for or presented at the meeting are exempt from disclosure."  ***Zellner***, 300 Wis. 2d 290, ¶54.  Thus a governmental body cannot rely on the mere fact of a closed meeting to justify a blanket nondisclosure of all meeting documents.  ***Id.***  Rather, under § 19.35(1)(a) and § 19.85(1)(e), there must be a

specific showing as to why "competitive or bargaining reasons require" nondisclosure.[14]

¶51    The City has not met this high burden.  In fact, it is Friends that has demonstrated that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.  *See* WIS. STAT. § 802.08(2).  That is, Friends has shown that regardless of whether the December 19, 2017 common council meeting was properly closed, "competitive or bargaining reasons" did *not* require nondisclosure of the draft contract at the time of the request.  In light of the merits-based inquiry that must determine Friends' prevailing-party status in this case, we reverse and remand to the trial court to grant summary judgment in favor of Friends, pursuant to § 802.08(6).  The further result is that Friends has "prevail[ed] in whole or in substantial part"; therefore, under the parameters set forth below, Friends is entitled to "reasonable attorney fees, damages of not less than $100, and other actual

---

[14] These principles are in keeping with WIS. STAT. § 19.32(2), which defines "record" broadly but excludes "drafts, notes, preliminary computations, and like materials prepared for the originator's personal use or prepared by the originator."  The City has never disputed that the draft contract is a public record, no doubt because it rightly recognizes that the term "draft" in this context "is to be construed narrowly."  *See* 77 Op. Att'y Gen. 100, 102 (1988).  Thus, to use the attorney general's example, drafts made for personal use or even shared collegially within an office are usually not public records, but, as here, once a draft is circulated outside that immediate circle, "public record" status generally attaches.  *Id.* at 102-03; *see also* **State v. Beaver Dam Area Dev. Corp.**, 2008 WI 90, ¶¶37, 312 Wis. 2d 84, 752 N.W.2d 295 (because "[t]he legislature has expressly charged the state attorney general with interpreting the … public records statutes….  [t]he interpretation advanced by the attorney general is of particular importance" in a public records action).  Nothing in this opinion is meant to suggest that drafts, notes, and similar internally maintained materials should be available for disclosure.  On the other hand, a "draft" contract exchanged with a nongovernmental third party with whom the government is negotiating may only be withheld by a showing that it falls within a recognized public records exception.

costs" for that portion of its action that relates to its October 9, 2017 public record request for the draft contract.[15] *See* WIS. STAT. § 19.37(2)(a).

*Factors to Be Addressed on Remand in Arriving at an Award of Reasonable Attorney Fees*

¶52    Since on remand the trial court should determine the amount of fees permitted, we view it appropriate to provide further guidance on this issue, particularly given some of the unique attributes of this case. Generally speaking, our decision necessitates a remand for a determination of reasonable attorney fees under the "lodestar methodology" set forth in ***Kolupar v. Wilde Pontiac Cadillac, Inc.***, 2004 WI 112, ¶¶23-30, 275 Wis. 2d 1, 683 N.W.2d 58. However, we also emphasize that, at least on this record, Friends may recover fees only for those tasks relating to disclosure of the draft contract that was the subject of the October 9, 2017 records request. This is an important point because Friends made four other requests and its suit claimed noncompliance with some of these requests as well. The suit was dismissed as to these allegations and that dismissal was not appealed. Although we are satisfied that Friends has "prevailed in substantial part" with respect to the draft contract,[16] the fees it incurred may not have all contributed to that success, and those fees that did so contribute are further subject to a reasonableness inquiry.

¶53    Persuasive authority again aids our analysis. ***Hardy v. Bureau of Alcohol, Tobacco, Firearms & Explosives***, 293 F. Supp. 3d 17 (D.D.C. 2017), a

---

[15] The statute also allows for "actual damages" and, potentially, punitive damages for failure to comply with the public records law. *See* WIS. STAT. § 19.37(2), (3). Friends has not sought such damages, and we see no basis in this record to suggest that they would be appropriate. Remand should be limited to the issue of an award of actual costs and attorney's fees.

[16] The statute speaks in terms of prevailing "in whole or in substantial part in any action filed under sub. (1) relating to access to a *record* or part of a *record*." WIS. STAT. § 19.37(2)(a) (emphasis added). Use of the singular "record" suggests that the prevailing party standard should be considered with respect to individual records successfully obtained through the litigation.

recent FOIA case in which a plaintiff partially prevailed, in turn takes guidance from the United States Supreme Court in *Hensley v. Eckerhart*, 461 U.S. 424 (1983), and *Fox v. Vice*, 563 U.S. 826 (2011) (concerning fee-shifting provisions of the civil rights laws). The *Hardy* court noted that "[w]hen a plaintiff has achieved only partial or limited success '[t]here is no precise rule or formula' for determining the reasonable amount of attorneys' fees." *Hardy*, 293 F. Supp. 3d at 30, *citing Hensley*, 461 U.S. at 436. In such cases, a trial court "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success," with the goal being to "award only that amount of fees that is reasonable in relation to the results obtained." *Hardy*, 293 F. Supp. 3d at 30, *citing Hensley*, 461 U.S. at 436, 440; *see also People for the Ethical Treatment of Animals v. National Insts. of Health*, 130 F. Supp. 3d 156, 166 ("The degree of plaintiff's success is the 'most critical factor' in determining the reasonableness of a fee award." (citation omitted)). The *Hardy* court further acknowledged that the goal is "to do rough justice, not to achieve auditing perfection." *Hardy*, 293 F. Supp. 3d at 30, *citing Fox*, 563 U.S. at 838. This, in turn, allows trial courts to "take into account their overall sense of a suit, and … use estimates in calculating and allocating an attorney's time." *Id.*

¶54    Finally, we note that much, perhaps most, of the fees in this case were incurred after release of the record at issue, meaning in some sense that fees were incurred to recover fees. This includes fees incurred in connection with this appeal. Pursuant to Wisconsin law, as well as FOIA, Friends' right to fees does not per se preclude the recovery of "fees for fees." *See Chmill v. Friendly Ford-Mercury*, 154 Wis. 2d 407, 414-15, 453 N.W.2d 197 (Ct. App. 1990); *Hardy*, 293 F. Supp. 3d at 32-33. The trial court might consider this circumstance, however, in assessing what portion of fees are recoverable. After all, awards are only for "*reasonable*

attorney fees," WIS. STAT. § 19.37(2)(a) (emphasis added), which invites consideration as to "whether costs could have been avoided by a reasonable and prudent effort," *Aspen Services, Inc. v. IT Corp.*, 220 Wis. 2d 491, 499, 583 N.W.2d 849 (Ct. App. 1998). Thus, "[a] plaintiff may not unnecessarily run up its legal bill in the expectation that the breaching party will ultimately pick up the entire tab." *Id.* at 499 (citation omitted); *see also Kolupar*, 275 Wis. 2d 1, ¶¶23-30. We note also that an attorney fee award should not include fees incurred to actually review or utilize the documents obtained (here, the draft contract) unless it is shown that such a review is relevant to the question of whether there was a violation of the statute. [17] *Hardy*, 293 F. Supp. 3d at 30-31.

¶55 We do not mean to suggest that all these considerations necessarily apply but simply note some of the factors that may go into determining a "reasonable" fee award. The parties and the trial court will be in a much better position than this court to advance, weigh, and determine these issues upon remand, and we defer to the trial court's sound discretion as to the appropriate mechanism for doing so.

*By the Court.*—Order reversed and cause remanded with directions.

---

[17] This point is particularly applicable here since, as previously noted, the draft contract was not made part of the record below and was improperly attached to Friends' appendix in the briefing to this Court. Accordingly, its specific content has necessarily played no part in contributing to Friends' success in this litigation. We do not, however, suggest that review of the contents of released records can never be part of a fee award. To the contrary, there may be situations where the specific content of such records is relevant, or even critical, in deciding whether there has been a violation of the statute.